**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CYTODYN, INC. | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | Civil Action No. 21-2533 |
| *v.* | ) | |
| | ) | |
| | ) | |
| AMAREX CLINICAL RESEARCH, LLC, | ) | |
| and NSF INTERNATIONAL, INC. | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF CYTODYN, INC.'S**
**MOTION FOR A PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................5

    A.    CytoDyn Hires Amarex To Help Study Leronlimab ...................................5

    B.    The Relationship Between CytoDyn and Amarex Collapsed......................9

    C.    Amarex Is Blocking CytoDyn's Full Access to its own Data. .................10

LEGAL STANDARD.......................................................................................13

I.     CYTODYN IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS FOR BREACH OF CONTRACT AND TORT. ...........................................................14

    A.    Amarex Has Breached the MSA's Requirement To Turn Over Full Access to CytoDyn's Data. ....................................................................................14

    B.    Amarex Has Breached the MSA's Audit Clause.....................................16

    C.    Amarex Is Converting, and Trespassing On, CytoDyn's Property in the EDCs and Other Clinical Data................................................................17

II.    CYTODYN WILL SUFFER IRREPARABLE INJURY IF PRELIMINARY RELIEF IS NOT GRANTED. ................................................................................18

III.  THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF FOR CYTODYN. ...........................................................20

CONCLUSION................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Bio-Tech. Gen. Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996)..........................................................................19

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012)...................................................................19, 20

*Cochran v. Norkunas*,
    919 A.2d 700 (D. Md. 2007)...........................................................................15

*Comptroller of Treasury v. Blanton*,
    890 A.2d 279 (D. Md. 2006)...........................................................................16

*Hardie v. Deutsche Bank Tr. Co. Am.*,
    No. CV TDC-20-1135, 2021 WL 2458061 (D. Md. June 16, 2021)......................18

*ICENY USA, Inc. v. M & M's, LLC*,
    421 F. Supp. 3d 204 (D. Md. 2019)..................................................................15

*Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*,
    918 F.3d 353 (4th Cir. 2019) ..........................................................................14

*Nordstrom, Inc. v. Schwartz*,
    No. GJH-18-3080, 2019 WL 4221475 (D. Md. Sept. 5, 2019) .............................18

*Otsuka Pharm. Co. v. Burwell*,
    No. GJH-15-852, 2015 WL 1962240 (D. Md. Apr. 29, 2015) ........................19, 21

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ....................................................................19, 21

*Porter v. Gen. Boiler Casing Co.*,
    396 A.2d 1090 (D. Md. 1979)...........................................................................7

*Roderer v. Treister*,
    2 F. Supp. 3d 1153 (D. Or. 2014) ....................................................................23

*Signature Flight Support Corp. v. Landow Aviation Ltd.*,
    698 F. Supp. 2d 602 (E.D. Va. 2010) ................................................................22

*Stern v. Bd. of Regents*,
    846 A.2d 996 (D. Md. 2004)............................................................................7

*Toolchex, Inc. v. Trainor*,
    634 F. Supp. 2d 586 (E.D. Va. 2008) ................................................................22

*Trs. of Heating, Piping, & Refrigeration Pension Fund v. Clean Air Mech., Inc.*,
   2019 WL 2146916 (D. Md. May 16, 2019)....................................................................21, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).........................................................................................................................23

*WSC/2005 LLC. V. Trio Ventures Assocs.*,
   190 A.3d 255 (D. Md. 2018)...................................................................................................15

## INTRODUCTION

This lawsuit seeks a preliminary injunction to protect the 67 patients with treatment-resistant HIV and 25 patients with non-alcoholic steatohepatitis (a kind of liver disease) currently receiving CytoDyn's drug, leronlimab, in clinical trials. Amarex, the clinical research organization managing the trials, has threatened to end these trials and cease all safety monitoring for them, while simultaneously cutting off CytoDyn from full access to the clinical trial data necessary for it to take over the administration and safety monitoring for the trials. Based upon this serious threat to the safety of the patients currently enrolled in the studies and to protect the integrity of the clinical trial data, CytoDyn is seeking a preliminary injunction.

## BACKGROUND

### A.     CytoDyn Hires Amarex To Help Study Leronlimab

CytoDyn is a biotech company focused on the clinical development of leronlimab, an investigational drug being studied as a treatment for HIV, cancer, COVID-19, and other serious diseases. Oct. 4, 2021 Declaration of Dr. Christopher Recknor, M.D., ¶ 3. In order to seek FDA approval for leronlimab, CytoDyn has sponsored 22 clinical trials in which the drug has been or is being tested for safety and efficacy. *Id.* ¶ 4. There are currently four main trials in which patients are receiving leronlimab: three studies of HIV, and one study of non-alcoholic steatohepatitis (NASH). *Id.* ¶ 5.

CytoDyn engaged Amarex to manage the clinical trials of leronlimab, as its contract research organization (CRO). *Id.* ¶ 6. CROs are clinical research specialists with extensive experience conducting clinical trials and complex medical testing. *Id.* ¶ 7. CytoDyn and Amarex formed a Master Services Agreement (MSA) in May 2014. **Exhibit A (MSA)**; Oct. 4, 2021 Declaration of Dr. Nader Pourhassan, Ph.D., ¶ 3.  The MSA set up a framework for Amarex to run

studies that CytoDyn would sponsor and Amarex would agree to conduct. *See generally* MSA. The work on individual studies would be documented in specific project work orders. MSA § 1.1.

Although neither Amarex nor CytoDyn signed the MSA, both parties understood the MSA to be a complete embodiment of their agreement and both parties acted accordingly.[1] Pourhassan Decl. ¶ 4. Since 2014, both Amarex and CytoDyn have treated the MSA as a binding agreement governing their relationship. *Id.* ¶ 5. Amarex and CytoDyn have each signed over 70 project work orders obligating Amarex to conduct clinical trial management on all but two of CytoDyn's studies. *Id.* ¶ 6. Those fully executed project work orders expressly incorporate the MSA. Amarex has also sent hundreds of invoices to CytoDyn for work performed under the MSA and work orders. *Id.* ¶ 7. CytoDyn has paid more than $80 million pursuant to the MSA and those work orders. *Id.* ¶ 8.

Under these work orders, Amarex had complete responsibility for the clinical trials. Specifically, Amarex was required to, among other things:

a. "Communicate with Sponsor"—*i.e.*, CytoDyn

b. "Develop Data Management Plan"

c. "Code Adverse Events and Medications"

d. "Perform Data Transfer to Sponsor"

e. "EDC [Electronic Data Capture] Maintenance"

---

[1] The contract is valid and enforceable under Maryland law despite not being signed. "Ordinarily, 'a signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract.'" *Stern v. Bd. of Regents*, 846 A.2d 996 (Md. 2004) (quoting *All State Home Mortg., Inc. v. Daniel*, 977 A.2d 438, 447 (Md. 2009)). *See also Porter v. Gen. Boiler Casing Co.*, 396 A.2d 1090 (Md. 1979) ("[T]he making of a valid contract requires . . . no signatures unless the parties have made them necessary at the time they expressed their assent and as a condition modifying that assent" (quoting 1 Arthur L. Corbin, *Corbin on Contracts* § 31, at 114 (1963))).

  f. "Conduct QC of EDC Database"

  g. "Perform Site Management"

  h. "Write and Review Standard Monitoring Report"

  i. "Prepare Safety Management Plan"

  j. "Set Up EDC Safety Management Module"

**Exhibit B** (Project Work Order).

  In addition to the Project Work Orders, the parties also signed a Monitoring Plan for each study. Recknor Decl. ¶ 9. The Monitoring Plans expressly required Amarex to conduct safety and other monitoring for the clinical trials. *Id.* ¶ 10. The Monitoring Plans explained that "Compliance with this guidance . . . ensures that the trial is conducted in accordance with the principles of Good Clinical Practice" and with federal regulations of clinical trials. **ExhibitC** (Monitoring Plan). The monitoring plans specified what Amarex was required to do at each trial site, *id.* at 14-20 (describing documentation, product accountability, site supply, and randomization procedures), as well as Amarex's obligation to communicate with CytoDyn regarding the progress of the trials and Amarex's performance of its monitoring duties, *id.* at 11-12. The requirements for monitoring visits are also defined in detail. *Id.* at 21-42.

  One of the main things Amarex did for each clinical trial was maintain CytoDyn's data. Recknor Decl. ¶ 11. The dynamic data used and collected in a clinical trial is maintained, by a process of collection and ongoing quality control, in a dynamic database known as the "electronic data capture" or the "EDC." *Id.* ¶ 12.  This EDC database is purpose-built for each study according to the study protocol, and includes all data collected on patients enrolled in the studies. *Id.* ¶ 13. In the HIV studies for example, the data includes patient demographics, medical history, vital signs, electrocardiogram data, biochemistry, coagulation tests, urinalysis, adverse events, concomitant

medications, treatment data, survival follow-up, and death information. *Id.* ¶ 14.  The EDC database has significant patient safety implications. *Id.* ¶ 15.  It is used to track adverse events and ensure proper adverse event reporting to the FDA. *Id.* ¶ 16.  It is also the means by which the sponsor—CytoDyn—can verify that the study is being conducted in accordance with the study protocol, including that study participants are included or excluded properly, and that data entry is being performed correctly at the trial sites. *Id.* ¶ 18.  Pursuant to work orders under the MSA, Amarex programmed and maintained, at CytoDyn's expense, the EDC for each study. *See* **Exhibit B** (Work Order 37, including "EDC Programming," "EDC Maintenance," and "Conduct QC of EDC Database" among Amarex's responsibilities); Recknor Decl. ¶ 19.

CytoDyn owns the EDCs, which are an indispensable component of the clinical trial data. Without the EDCs, the raw information contained in the database is effectively useless: the EDCs define the meaning of the information in each database field, and maintains an audit trail of each time a record is updated, which is necessary to ensure data integrity for FDA purposes. The MSA explains that all such study data is the property of CytoDyn, which owns "all right, title and interest" to clinical data collected from its trials. MSA § 5.2. Specifically, "CytoDyn owns all right, title and interest . . . in and to all  information, materials, documents and raw data (i) supplied to Amarex, including without  limitation clinical data, in connection with this Agreement; (ii) developed by Amarex as a  result of performing the Services, including without limitation any Deliverables; and (iii) CytoDyn's Confidential Information (all such information and materials, 'Client  Materials')." MSA § 5.2.[2]

___

[2] The MSA is expressly "governed by the laws of the State of Maryland[.]" MSA §  15.3.

**B.     The Relationship Between CytoDyn and Amarex Collapsed.**

After years of what CytoDyn thought was a productive partnership, the relationship between CytoDyn and Amarex began to break down. Pourhassan Decl. ¶ 9. CytoDyn has uncovered that Amarex has failed to perform certain of its responsibilities under the MSA, work orders, and monitoring plan. *Id.* ¶ 10. Amarex has covered up its failures by making false statements to CytoDyn about the work it performed and by failing to provide CytoDyn with information to which it is entitled. *Id.* ¶ 11; Recknor Decl. ¶ 20.

One of the ways CytoDyn has confirmed that Amarex is not performing under the MSA and the Work Orders is by downloading a snapshot of the clinical data for certain clinical trials managed by Amarex. Recknor Decl. ¶ 21. This snapshot is incomplete: it does not include the definitions of the EDC fields (*i.e.*, the database's "column headings"), the audit trails showing each time the data has been modified, the auto-generated "data queries" that are essential to cleaning and maintaining the clinical data, or many other of the essential components of the clinical data that can only be obtained through full access to the EDC. *Id.* ¶ 22. It is impossible for CytoDyn to monitor the ongoing trials or to submit applications to the FDA based on the data contained in the snapshots. *Id.* ¶ 24. However, these limited snapshots are enough for CytoDyn to confirm that the clinical data for multiple studies is in disarray and has not been maintained by Amarex as the parties' agreements require. *Id.* ¶ 25.

Amarex has continued to submit invoices for work that CytoDyn does not believe Amarex actually performed, and for work that it did not perform in compliance with the MSA, work orders, and relevant standards. Pourhassan Decl. ¶ 12. CytoDyn has therefore refused to pay Amarex for a number of outstanding invoices. *Id.* ¶ 13. Amarex demanded payment under the invoices and has refused to do any more work, until CytoDyn pays the outstanding invoices. *Id.* ¶ 14. In order to

resolve that monetary dispute, pursuant to the MSA, CytoDyn has filed a demand for arbitration with the American Arbitration Association. *See* **Exhibit D** (Demand for Arbitration).

The MSA includes an arbitration clause providing that "[a]ll claims arising under or relating to this Agreement, including any claims created by statutory law, will be decided by final and binding arbitration. . . . This provision will provide the exclusive means for dispute resolution, provided, however, that *neither party will be prohibited from proceeding in a court to seek injunctive relief or other equitable remedies pending arbitration*." MSA § 15.4 (emphasis added). Although the parties' monetary dispute will be arbitrated, CytoDyn is bringing this suit for injunctive relief pending the arbitration.

CytoDyn is seeking this preliminary injunction to stop Amarex from imperiling the ongoing clinical trials and putting patient safety at risk while the arbitration is pending.

### C.    Amarex Is Blocking CytoDyn's Full Access to its own Data.

When the relationship between the parties broke down, Amarex repeatedly stated that it would provide a transition plan so that CytoDyn could take over the studies and patient safety can be assured. Pourhassan Decl. ¶ 15. However, on September 23, 2021, rather than provide an actual transition plan, Amarex informed CytoDyn that it is suspending all activities including safety monitoring for the ongoing clinical trials and that CytoDyn must take over all clinical trial management activities immediately. *Id.* ¶ 16. CytoDyn stands ready to take on this responsibility. *Id.* ¶ 17; Recknor Decl. ¶ 26. In order to manage the ongoing clinical trials, however, CytoDyn needs full access to the data from the clinical trials, including the EDC itself, without which the raw data is useless to CytoDyn. Recknor Decl. ¶¶ 22, 24, 27. CytoDyn has repeatedly requested that Amarex give it full access to its own study data and the EDCs, but Amarex has refused. *Id.* ¶ 28. CytoDyn cannot wait until the resolution of the arbitration to get its EDCs and data back. *Id.* ¶

29. Every day that Amarex holds the EDCs and the data hostage, patients are at risk and the integrity of the data is compromised. *Id.* ¶ 30.

The EDC database is required to monitor the safety of the clinical studies. *Id.* ¶ 31. It is used to track adverse events and ensure proper adverse event reporting to the FDA. *Id.* ¶ 32. It is also the means by which the sponsor—CytoDyn—can verify that the study is being conducted in accordance with the study protocol, including that study participants are included or excluded from the study based on the correct criteria, and that data entry is being performed correctly at the trial sites. *Id.* ¶ 33. The EDC for each trial is built to conform to the data requirements of the study protocol. *Id.* ¶ 34. Pursuant to work orders under the MSA, Amarex programmed and maintained, at CytoDyn's expense, the EDC for each study. *See* **Exhibit B** (Work Order 37, including "EDC Programming," "EDC Maintenance," and "Conduct QC of EDC Database" among Amarex's responsibilities).

It is clear that under the contract, CytoDyn has the complete right to this data. The MSA explains that all study data is the property of CytoDyn, which owns "all right, title and interest" to clinical data collected from its trials, including the EDC, which is purpose-built for each trial. MSA § 5.2. Amarex has no ownership right to data collected from CytoDyn's clinical studies: "CytoDyn owns all right, title and interest . . . in and to all  information, materials, documents and raw data (i) supplied to Amarex, including without  limitation clinical data, in connection with this Agreement; (ii) developed by Amarex as a  result of performing the Services, including without limitation any Deliverables; and (iii) CytoDyn's Confidential Information (all such information and materials, 'Client  Materials')." MSA § 5.2.[3]

---

[3] Section 5.2 of the MSA reads in full: "Except that Amarex shall own all rights, title and interest to any innovative methodology  developed which has generic applications and is not specific to

Upon CytoDyn's request, the MSA requires that Amarex return the data from any clinical study immediately. Section 4.1 provides that "[a]ll Client Materials (as defined in Section 5.2) shall be deemed the 'Confidential Information' of CytoDyn," and "[e]ach party agrees, . . . except as needed to fulfill its obligations hereunder, *to return or destroy any Confidential Information to* [*CytoDyn*] *at the request and cost of* [*CytoDyn*.]"[4] MSA § 4.1. Included in the definition of "client materials" is "all information, materials, documents and raw data (i) supplied to Amarex, including without limitation clinical data, in connection with this agreement; (ii) developed by Amarex as a result of performing the Services, . . . and (iii) CytoDyn's Confidential Information[.]" MSA § 5.2.

Amarex has also denied CytoDyn its contractual right to audit Amarex's records at any time to ensure its compliance with the contract. MSA § 2.4. Specifically, the MSA provides:

---

any particular CytoDyn  Project, CytoDyn owns all right, title and interest, including all patents, copyrights,  trademarks, and all other intellectual property or other proprietary rights, in and to all information, materials, documents and raw data (i) supplied to Amarex, including without limitation clinical data, in connection with this Agreement; (ii) developed by Amarex as a  result of performing the Services, including without limitation any Deliverables; and (iii) CytoDyn's Confidential Information (all such information and materials, 'Client  Materials'). All Deliverables are works made for hire and Amarex hereby assigns all  right, title and interest, including all patents, copyright, trademarks and any other  intellectual property or other proprietary rights in the Deliverables to CytoDyn. Amarex  will take all action reasonably requested by CytoDyn to vest ownership of any of the  Deliverables in CytoDyn and to permit CytoDyn to seek patent, copyright, trademark or  similar protection in its name."

[4] The MSA describes this obligation in terms of a "Disclosing Party" and a "Receiving Party," but it applies to more than just information sent from CytoDyn to Amarex or vice-versa, as the context makes clear: "'Confidential Information' means all information provided by or on behalf of one party (the 'Disclosing Party') to the other party in connection with this Agreement and the Services including without limitation, all . . . information acquired or developed in or as a result of the performance of this Agreement, whether in oral, written, graphic or electronic form. Without limiting the  generality of the foregoing, all Client Materials (as defined in Section 5.2) shall be  deemed the 'Confidential Information' of CytoDyn." MSA § 4.1. As discussed above, the "client materials" include "information . . . developed by Amarex as a result of performing the Services[.]" MSA § 5.2. Together, these clauses make clear that the "Disclosing Party" referred to in the MSA is better understood as the party that owns the information, regardless of how the "Receiving Party" came to possess the information.

"Amarex will maintain accurate, complete, and current records relating to all Services. Amarex will furnish to CytoDyn all data, information, and records maintained in connection with the Services as well as written reports of the process of the Services at reasonable times upon CytoDyn's request. CytoDyn shall be entitled, with at least 24 hours' prior notice, to audit and inspect records, facilities used, and the conduct of the Services relating to a Project Work Order under this Agreement. CytoDyn will not be responsible for payment to Amarex for time spent on audits." MSA § 2.4. On August 2, 2021, and again on August 3, 2021, CytoDyn demanded that Amarex make its facilities available (for a virtual or in person) audit under the MSA. **Exhibit E** (email demanding audit); Pourhassan Decl. ¶ 18; Recknor Decl. ¶ 36. CytoDyn believed this audit was necessary to determine what else Amarex was failing to do and to protect the integrity of its clinical trial programs. Pourhassan Decl. ¶ 19; Recknor Decl. ¶ 37. On August 9, 2021, Amarex refused to consent to the audit. **Exhibit E** (email refusing audit); Recknor Decl. ¶ 38.

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must demonstrate four factors: (1) a likelihood of success on the merits; (2) irreparable harm absent the requested relief; (3) that the balance of equities tips in the movant's favor; (4) that an injunction is in the public interest. *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

CytoDyn will succeed on its claim that Amarex breached the MSA, both by failing to turn over complete access to the data that belongs to CytoDyn, including the EDC, and by failing to comply with the audit to which CytoDyn is contractually entitled. Amarex's conduct is also tortious, constituting both conversion and trespass to chattels under Maryland law. CytoDyn, and the patients receiving leronlimab in its clinical trials, are being irreparably injured—and will

continue to be injured—if this conduct is not enjoined. The balance of equities strongly favors CytoDyn, since there will be no harm to Amarex from being required to turn over access to data it does not own, and the public interest is served by promoting the performance of contracts and the speedy approval of safe and effective treatments for seriously ill patients. This Court should therefore issue a preliminary injunction.

## I.   CYTODYN IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS FOR BREACH OF CONTRACT AND TORT.

The record "clearly demonstrate[s]" that CytoDyn "will likely succeed on the merits" of its claims. *ICENY USA, Inc. v. M & M's, LLC*, 421 F. Supp. 3d 204, 215 (D. Md. 2019). To prevail on a breach of contract claim under Maryland law, CytoDyn "must simply show that 'the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation.'" *WSC/2005 LLC. V. Trio Ventures Assocs.*, 190 A.3d 255, 265 (Md. 2018) (quoting *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (2001)). CytoDyn readily satisfies both elements here. Amarex has breached the MSA in two key ways: it has refused to turn over full access to CytoDyn's EDC and other clinical data, as the contract requires; and it has failed to permit the audit to which CytoDyn is contractually entitled.

### A.   Amarex Has Breached the MSA's Requirement To Turn Over Full Access to CytoDyn's Data.

The MSA makes clear that CytoDyn owns the EDC for each clinical trial and the data produced in the trials, and that Amarex is required to turn over access to the EDC and data to CytoDyn. *See Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007) ("If the language of the contract is unambiguous, we give effect to its plain meaning . . . .").

CytoDyn "owns all right, title, and interest . . . in and to all information, material, documents, and raw data [] supplied to Amarex, including without limitation clinical data." MSA

14

§ 5.2. Amarex has no right to such data, which it possesses only by virtue of its contractual relationship with CytoDyn. Pourhassan Decl. ¶ 21; Recknor Decl. ¶ 39.

Not only does the MSA confirm that the EDC and other data are CytoDyn's, not Amarex's, it also makes it clear that Amarex must "return" them to CytoDyn on demand. MSA § 4.1(e); *see also id.* § 2.4 ("Amarex will furnish to CytoDyn all data, information, and records maintained in connection with the Services . . . at reasonable times upon CytoDyn's request[.]"). The MSA's definition of "Confidential Information" includes "Client Materials," which, in turn, includes "information, materials, documents and raw data [] supplied to Amarex, including without limitation clinical data," as well as "information, materials, documents and raw data . . . developed by Amarex as a result of performing the Services[.]" *Id.* §§ 4.1, 5.2. Accordingly, the MSA imposes a duty on Amarex to return CytoDyn's EDCs and other clinical data, as well as any other "information . . . acquired or developed [by Amarex] in or as a result of the performance of this Agreement," at CytoDyn's request. *Id.* § 4.1(e).

The MSA lacks any provision that would permit Amarex to withhold EDCs or other data requested by CytoDyn. In fact, the MSA only permits Amarex to withhold "the results of data *analysis* for any Data Safety Monitoring Board Meetings, Interim Analyses, and/or Final Analyses" if CytoDyn's payment obligations are not fulfilled. MSA § 3.4. But CytoDyn is not asking Amarex to turn over "the results of data analysis" of any kind. Recknor Decl. ¶ 40. Rather, CytoDyn is only asking for Amarex to turn over *CytoDyn's EDCs and data*, which are "client materials" as defined in the MSA. If the parties had intended to make CytoDyn's access to its own EDCs and other clinical data dependent on payments under the MSA, they could have said so.  In fact, they *did* say so with regard to certain categories of data analysis. *Comptroller of Treasury v.*

*Blanton*, 890 A.2d 279, 285 (2006) ("Maryland has long accepted the doctrine of *expressio (or inclusio) unius est exclusio alterius*, or the expression of one thing is the exclusion of another.").

Amarex cannot dispute that it has refused—and continues to refuse—to return CytoDyn's EDCs and other proprietary data despite CytoDyn's repeated requests. **Exhibit E**, Aug. 2, 2021 Letter from Patrick M. McCarthy ("All data . . . transfers to CytoDyn for [its] trials, however, [are] suspended."); Recknor Decl. ¶ 41. This refusal violates Amarex's contractual obligation and is a breach of contract.

### B.    Amarex Has Breached the MSA's Audit Clause.

CytoDyn is also likely to succeed on its claim that Amarex breached the MSA's audit clause.  That clause provides that  "CytoDyn shall be entitled, with at least 24 hours' prior notice, to audit and inspect records, facilities used, and the conduct of the Services relating to a Project Work Order under this Agreement," and that "CytoDyn will not be responsible for payment to Amarex for time spent on audits." MSA § 2.4.

CytoDyn has repeatedly attempted to exercise its audit rights under the MSA, while Amarex has repeatedly refused. Pourhassan Decl. ¶ 22; Recknor Decl. ¶ 43. Most recently, CytoDyn wrote to Amarex on August 2 and 3, 2021, to request Amarex's consent to an independent audit commissioned by CytoDyn. Recknor Decl. ¶ 32. Amarex refused to cooperate, citing Covid-19 restrictions.  However, when the auditor made clear that the audit could be conducted remotely and in accordance with Covid-safe protocols, Amarex pointed to CytoDyn's alleged nonpayment as the basis for the refusal of the audit. *Id.* ¶ 38.

Nothing in the contract conditions CytoDyn's audit rights on payment of outstanding invoices: in the event of nonpayment, the MSA allows Amarex to suspend performance only of "Services,"  defined as "clinical  trial  management  services  and consulting services . . . as the parties may agree in writing in a Project Work Order." MSA § 1.1. Cooperating with an audit is

not "services" and may not be refused based on alleged nonpayment. Pourhassan Decl. ¶ 23; Recknor Decl. ¶ 42. Amarex's refusal to allow an audit is therefore a separate instance of breach of contract that CytoDyn will succeed in demonstrating.

**C.     Amarex Is Converting, and Trespassing On, CytoDyn's Property in the EDCs and Other Clinical Data.**

CytoDyn is also likely to succeed on the merits of its tort claims because Amarex's wrongful withholding of CytoDyn's EDCs and other data constitutes both conversion and trespass to chattels.

"Under Maryland law, conversion consists of 'any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it.'" Conversion can occur 'either by initially acquiring the property or by retaining it longer than the rightful possessor permits.'" *Hardie v. Deutsche Bank Tr. Co. Am.*, No. CV TDC-20-1135, 2021 WL 2458061, at *5 (D. Md. June 16, 2021) (quoting Allied Inv. Corp. v. Jasen, 731 A.2d 957, 963 (Md. 1999), and *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004)). All clinical data from CytoDyn's clinical trials, including the EDCs themselves and other Client Materials as defined by Section 5.2 of the MSA, are the personal property of CytoDyn. CytoDyn is the rightful owner of the EDCs and other clinical data. Recknor Decl. ¶ 44. CytoDyn has revoked its permission for Amarex to possess the clinical data and the EDCs, but Amarex has nevertheless refused to return them to CytoDyn. *Id.* ¶ 45. Amarex therefore is exerting ownership and dominion over CytoDyn's personal property, in denial of or inconsistent with CytoDyn's property rights. Amarex is also retaining CytoDyns's property longer than CytoDyn, as its rightful possessor, permits. *Id.* ¶ 46. This is conversion under Maryland law.

"[T]respass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Nordstrom, Inc.*

17

*v. Schwartz*, No. GJH-18-3080, 2019 WL 4221475, at *2 (D. Md. Sept. 5, 2019) (quoting Restatement (Second) of Torts § 217). CytoDyn is entitled to rightful possession of its EDCs and other clinical data and Client Materials as defined by Section 5.2 of the MSA. Recknor Decl. ¶ 47. Amarex has dispossessed CytoDyn of its EDCs and data, which constitutes trespass to chattels.

Because CytoDyn is likely to succeed on each of its counts, the first element necessary for a preliminary injunction is met.

## II.   CYTODYN WILL SUFFER IRREPARABLE INJURY IF PRELIMINARY RELIEF IS NOT GRANTED.

CytoDyn is "likely to suffer irreparable harm in the absence of preliminary relief." *Pashby v. Delia*, 709 F.3d 307, 328 (4th Cir. 2013) (quoting *Winter,* 555 U.S. at 20). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). Even "monetary losses" may be irreparable if they are "so severe that they threaten the very existence of the company." *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015); *see also Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996) (affirming finding of irreparable harm where plaintiff "would lose revenues and goodwill, and would be required to reduce its research and development activities").

Amarex's plan to discontinue medical and safety monitoring of CytoDyn's trials without turning over full access to CytoDyn's EDCs and clinical data will cause immediate and irreparable harm to CytoDyn. Pourhassen Decl. ¶ 24; Recknor Decl. ¶ 48. Without the EDCs and data, CytoDyn cannot take over management and safety monitoring for the studies before the deadlines imposed by Amarex. *Id.* ¶ 49.  This means that the studies will experience a gap in monitoring and

may not be useable for FDA approval.  *Id.* ¶ 50.  This will cause irreparable harm to both CytoDyn and its patients. Pourhassan Decl. ¶ 24; Recknor Decl. ¶ 51.

At the outset, the parties expressly agreed in the MSA that a "breach or threatened breach of this Section 4," which requires Amarex to return CytoDyn's data upon request, "may cause immediate and irreparable harm to the Disclosing Party[5] which may not be adequately compensated by damages." MSA § 4.4. The parties' agreement alone supports a finding of irreparable harm.

As to CytoDyn, Amarex's actions will cause it to lose investor goodwill. Pourhassan Decl. ¶ 25; *see Celsis In Vitro, Inc.*, 664 F.3d at 930 ("loss of goodwill" is irreparable harm).  Investors, without whom CytoDyn cannot sustain its operations, will not be willing to invest in CytoDyn if its clinical trial program collapses. Pourhassan Decl. ¶ 26.

CytoDyn will also suffer serious damage to its reputation with doctors, patients and the FDA. *Id.* ¶ 27; *see Celsis In Vitro, Inc.*, 664 F.3d at 930 ("damage to reputation" is irreparable harm).  Good clinical practice and data integrity are the bedrock of a healthcare company, especially one like CytoDyn that is developing a novel, experimental treatment for deadly diseases. Pourhassan Decl. ¶ 28. Doctors and their patients must be able to trust the companies that develop their medicines, and when a healthcare company's reputation for reliability and trustworthiness is tarnished, the consequences can be dire. *Id.* ¶ 29. If CytoDyn's clinical trials either shut down prematurely or are not properly monitored, its reputation will be damaged. *Id.* ¶ 30.

For similar reasons, CytoDyn will also lose business opportunities without an injunction. *Id.* ¶ 31; *see Celsis In Vitro, Inc.*, 664 F.3d at 930 ("loss of business opportunities" is irreparable

---

[5] Although the MSA uses the term "disclosing party," the term applies broadly to information that CytoDyn owns but that is in Amarex's possession, as discussed above. *See supra* n.4.

harm).  Other companies in the industry that would otherwise be willing to work with CytoDyn will stay away due to CytoDyn's association with Amarex and the collapse of CytoDyn's leronlimab program due to Amarex's mismanagement of the trials. Pourhassan Decl. ¶ 32.

The totality of CytoDyn's losses due to Amarex's breaches and torts will be "so severe that they threaten the very existence of the company." *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015); Pourhassan Decl. ¶ 33. Leromlimab is CytoDyn's *only* drug candidate. A setback of this magnitude in the company's only clinical program may make it impossible for CytoDyn to continue to raise capital to fund its operations, and will place the prospect of FDA approval months if not years beyond CytoDyn's reach. *Id.* ¶ 34.

Separate and apart from the direct injury to CytoDyn, without an injunction patients will suffer irreparable harm. Recknor Decl. ¶ 51. The dozens of patients in CytoDyn's clinical trials today will be put at risk. *Id.* ¶ 52.  CytoDyn will either have to immediately stop the trials, in which case the patients will lose access to the drug. *Id.* ¶ 53.   Or the trials will continue without the necessary management and monitoring that CytoDyn can provide. *Id.*  Harm to patient health is the very definition of irreparable harm. Thus, this factor weighs in favor of granting the injunction.

## III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF FOR CYTODYN.

Finally, "the balance of hardships" and the public interest "tips in" favor of CytoDyn as well. *Pashby*, 709 F.3d at 329 (citing *Winter,* 555 U.S. at 20 (2008)). In contrast to the substantial and irreparable harm CytoDyn will suffer if Amarex continues to withhold CytoDyn's property, Amarex will suffer no harm should this Court require it to return CytoDyn's EDCs and data. Pourhassan Decl. ¶ 35. CytoDyn merely requests that Amarex comply with its contractual obligation. *Id.*  ¶ 36.; Recknor Decl. ¶ 54; *see Trs. of Heating, Piping, & Refrigeration Pension*

*Fund v. Clean Air Mechanical, Inc.*, 2019 WL 2146916, at *5 (D. Md. May 16, 2019) ("Compliance with a pre-existing legal obligation cannot fairly be considered a hardship."); *Signature Flight Support Corp. v. Landow Aviation Ltd.*, 698 F. Supp. 2d 602, 624 (E.D. Va. 2010) ("Granting the injunction will not harm Defendant because it merely forces [the defendant] to abide by its own contractual obligations."); *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 592 (E.D. Va. 2008) ("requiring a party to comply with its contractual obligations does not constitute harm"). As detailed above, Amarex has no ownership right to the EDCs and data, and thus cannot argue that an injunction would deprive it of any property interest in the EDCs and data.[6]

There is no burden on Amarex to provide CytoDyn with access to its EDCs and data. Recknor Decl. ¶ 55. Amarex simply must provide CytoDyn with a username and password to access OpenClinica, the web-based software that contains the EDCs and data. *Id.* ¶ 56. If there is some administrative cost associated with providing CytoDyn access to its EDCs and data (such as a fee to create a new administrative user account, or a hosting fee for maintaining storage of the data), CytoDyn is willing to pay that necessary administrative cost, as contemplated by the MSA. Pourhassan Decl. ¶ 37; Recknor Decl. ¶ 57; MSA § 4.1 (Amarex must "return or destroy any Confidential Information to [CytoDyn] at the request and cost of [CytoDyn]".) Accordingly, the balance of hardships weighs strongly in CytoDyn's favor. *See, e.g.*, *Trs. of Heating, Piping, & Refrigeration Pension Fund*, 2019 WL 2146916, at *5.

---

[6] The MSA does not preclude Amarex from "retain[ing] a single archival copy" of CytoDyn's data, MSA § 4.1, and CytoDyn does not object to Amarex retaining its own access. CytoDyn—as the sponsor of the clinical trials, and the party ultimately responsible for patient safety and FDA compliance—simply wants access to its EDCs and data on the same terms as its hired contractor, Amarex, which has a possessory right in the EDCs and data solely because of its relationship with CytoDyn.

The final factor, to which "courts of equity should pay particular regard," is whether a preliminary injunction is in the public interest. *Winter*, 555 U.S. at 24. Here, an injunction is in the public interest because Amarex's unlawful retention of CytoDyn's EDCs and data places patients receiving CytoDyn's experimental treatments at risk and "potentially compromise[es] ongoing research and treatments." *Roderer v. Treister*, 2 F. Supp. 3d 1153, 1163 (D. Or. 2014); Recknor Decl. ¶ 58.

This has immediate real-world effects. Across the nation, patients with life threatening diseases have been, and are being, treated with leronlimab. Recknor Decl. ¶ 59. Without full access to its EDCs and data, CytoDyn cannot ensure that trial sites are able to timely communicate any significant adverse safety event for proper reporting to the FDA. *Id.* ¶ 60. The delays and lack of audit trail associated with implementing a new system for adverse event reporting will put patients at risk and interfere with CytoDyn's ability to comply with FDA regulations. *Id.* Under FDA regulations, "significant adverse events"—*i.e.*, serious symptoms that may be side effects of the trial drug—must be reported to the trial monitor within 24 hours. *Id.* ¶ 61. Trial sites put the information about adverse events into the EDC database. *Id.* ¶ 62. The CRO or Sponsor then reviews that information to report it to the FDA. *Id.* ¶ 63. But without access to the EDC database, CytoDyn will be limited in its ability to see or identify any adverse event information that is reported by doctors, and reporting will have to be moved to unfamiliar channels, such as email or fax, that will introduce additional risk of errors. *Id.* ¶ 64. If adverse events are not tracked in an EDC, CytoDyn will lose the capability to readily identify trends and correlations in the adverse event data, which could suggest safety issues with the drug. *Id.* ¶ 65. This means adverse event reports to the FDA could be delayed or not identified. *Id.* ¶ 66. This is why it is crucial that Amarex

provide CytoDyn with full access to the EDC database so that it can properly monitor the studies. *Id.* ¶ 67.

Full access to the EDC database is also necessary for CytoDyn to ensure that the study protocols are being followed. *Id.* ¶ 68. A study sponsor—either itself or through a CRO—must monitor the clinical trial for compliance. *Id.* ¶ 69. The EDC is used to monitor compliance: for example, if a patient begins taking a concomitant medication that may interfere with the trial, that patient may need to be excluded from the study. *Id.* ¶ 70. In an emergency situation, it may even be necessary to "unblind" a study participant to determine whether the participant has received leronlimab or a placebo. *Id.* ¶ 71. This can be critically important because doctors may treat a medical emergency differently depending on whether it could be caused by the investigational drug. *Id.* ¶ 72. But without access to the EDC and a related software system called WebView, which Amarex is also shutting down, CytoDyn cannot unblind study participants and cannot track their progress through the study, which may be necessary to see whether the participant reported symptoms or had vital sign variations that may assist doctors in responding to the medical emergency. *Id.* ¶ 73.

The 67 HIV patients currently receiving leronlimab in CytoDyn's clinical trials have limited or no other treatment options. *Id.* ¶ 74. 24 of the HIV patients are enrolled in CytoDyn's trials specifically because their HIV is "treatment-resistant," meaning it has developed a resistance to up to three known classes of treatments for HIV. *Id.* ¶ 75. To withdraw leronlimab from these patients now—in the middle of the study, before the treatment's safety and efficacy can be properly assessed—would cause an avoidable loss of all the effort and investment, by both CytoDyn and the patients, in the studies to date. *Id.* ¶ 76.  To the extent leronlimab may be ameliorating the

patients' symptoms or even extending their lives, early termination is an avoidable tragedy that the Court should not permit. *Id.* ¶ 77.

Amarex is flouting its contractual obligations, obstructing ongoing and important clinical research, and putting vulnerable patients at risk, all over a contract dispute that will soon be arbitrated and resolved. If an arbitrator finds that CytoDyn has failed to pay Amarex for services Amarex actually rendered, then Amarex will be made whole. However, in the absence of an injunction, it will be impossible for any court to make CytoDyn whole, let alone to ameliorate damage done to patients enrolled in CytoDyn's studies. Accordingly, the public interest weighs in favor of an injunction.

## CONCLUSION

For the foregoing reasons, CytoDyn's motion for a preliminary injunction should be granted. Thus, this Court should order Amarex to return CytoDyn's proprietary data immediately by granting full access to the EDC and clinical data for each study, and cease obstructing the contractually required audit.

DATED: October 4, 2021

Respectfully submitted,

/s/ Jacquelyn E. Fradette
Mark D. Hopson*
Benjamin M. Mundel*
Jacquelyn E. Fradette
Lucas W.E. Croslow*
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000

*Counsel for Plaintiff CytoDyn, Inc.*

*Pro hac vice* application forthcoming

272560268

**APPENDIX OF EXHIBITS TO CYTODYN INC.'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR A
PRELIMINARY INJUNCTION**

| Exhibit | Document |
|---------|----------|
| A | May 2014 Master Services Agreement Between Amarex Clinical Research, LLC, and CytoDyn Inc. |
| B | Amarex Project Work Order 37 to Master Service Agreement |
| C | December 2015 Amarex Monitoring Plan, A Multi-center, Randomized, Double-blind, Placebo-controlled Trial, Followed by Single-arm Treatment of PRO 140 in Combination With Optimized Background Therapy in Treatment-Experienced HIV-1 Subjects. |
| D | October 4, 2021 CytoDyn Inc. AAA Demand for Arbitration Against Amarex Clinical Research LLC |
| E | August 2021 Email Thread Regarding Amarex In-Process Vendor Audit on behalf of CytoDyn |
| F | August 2, 2021 Letter from Patrick M. McCarthy, Counsel for Amarex Clinical Research, LLC to CytoDyn Inc re: Continued Demand for Payment of Outstanding Invoices/Suspension of Services |