IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CYTODYN, INC. </br></br>     *Plaintiff*, </br></br> v. </br></br> AMAREX CLINICAL RESEARCH, LLC, </br>and NSF INTERNATIONAL, INC. </br></br>     *Defendants*. | Civil Action No. 21-2533 |

### DECLARATION OF DR. NADER POURHASSAN, PH.D.
### IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Dr. Nader Pourhassan, Ph.D., declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Chief Executive Officer of CytoDyn, Inc. I have extensive knowledge of CytoDyn's research and development activities and its relationship with Amarex Clinical Research, LLC.

2. As CEO, I have overseen CytoDyn's development of leronlimab—a potentially lifesaving drug with application to multiple diseases, including HIV, cancer, liver disease and COVID-19.

3. CytoDyn and Amarex formed a Master Services Agreement in May 2014, whereby Amarex agreed to serve as CytoDyn's clinical research organization (CRO) for clinical trials of leronlimab.

1

4. Although neither Amarex nor CytoDyn signed the MSA, both parties understood the MSA to be a complete embodiment of their agreement and both parties acted accordingly.

5. Since 2014, both Amarex and CytoDyn have treated the MSA as a binding agreement governing their relationship.

6. Amarex and CytoDyn have each signed over 70 project work orders obligating Amarex to conduct clinical trial management on all but two of CytoDyn's 22 clinical studies of leronlimab. The parties also agreed to a monitoring plan for each study.

7. Amarex has also sent hundreds invoices to CytoDyn for work performed under the MSA and work orders.

8. It was reported to me by CytoDyn's CFO, Mr. Antonio Migliarese that CytoDyn has paid more than $80 million pursuant to the MSA and those work orders.

9. After years of what CytoDyn thought was productive partnership, the relationship between CytoDyn and Amarex began to break down.

10. It was reported to me by CytoDyn's COO, Dr. Chris Recknor that CytoDyn has uncovered that Amarex has failed to perform certain of its responsibilities under the MSA, work orders, and monitoring plans.

11. It was reported to me by CytoDyn's COO, Dr. Chris Recknor that Amarex has failed to provide CytoDyn with requested information for work it claims it has performed.

12. It was reported to me by CytoDyn's COO, Dr. Chris Recknor that Amarex has continued to submit invoices for work that CytoDyn does not believe Amarex actually performed and for work that it did not perform in compliance with the MSA, work orders, and relevant standards.

13. CytoDyn has therefore refused to pay Amarex for a number of outstanding invoices.

14. Amarex demanded payment under the invoices and has refused to do any more work, until CytoDyn pays the outstanding invoices.

15. When the relationship between the parties broke down, Amarex repeatedly stated that it would provide a transition plan so that CytoDyn could take over the studies and patient safety can be assured.

16. However, on September 23, 2021, rather than provide an actual transition plan, Amarex informed CytoDyn that it is suspending all activities including safety monitoring for the ongoing clinical trials and that CytoDyn must take over all clinical trial management activities.

17. CytoDyn stands ready to take on the responsibility of monitoring the clinical trials, but cannot do so without access to databases that Amarex refuses to provide.

18. On August 2, 2021, and again on August 3, 2021, CytoDyn demanded that Amarex make its facilities available (for a virtual or in person) audit under the MSA.

19. CytoDyn believed this audit was necessary to determine what else Amarex was failing to do and to protect the integrity of its clinical trial programs.

20. On August 9, 2021, Amarex refused to cooperate, citing Covid-19 restrictions. However, when the auditor made clear that the audit could be conducted remotely and in accordance with Covid-safe protocols, Amarex pointed to CytoDyn's alleged nonpayment as the basis for the refusal of the audit.

21. Amarex has no right to CytoDyn's clinical databases, which Amarex possesses only by virtue of its contractual relationship with CytoDyn.

22. CytoDyn has repeatedly attempted to exercise its audit rights under the MSA, while Amarex has repeatedly refused.

23. Cooperating with an audit is not "services" and may not be refused based on alleged nonpayment.

24. Amarex's plan to discontinue medical and safety monitoring of CytoDyn's trials without turning over CytoDyn's databases will cause immediate and irreparable harm to CytoDyn and the patients in CytoDyn's clinical trials.

25. Amarex's actions has and will continue to cause CytoDyn to lose investor goodwill. As the CEO of a publicly traded company, investor relations is an important part of my job, and I interact daily with major investors in CytoDyn. The delays in the leronlimab development program, which Amarex has caused, have already caused some of our investors, and potential future investors, to have concerns about investing in CytoDyn.

26. Investors, without whom CytoDyn cannot sustain its operations will not be willing to invest in CytoDyn if its clinical trial program collapses.

27. CytoDyn already has and will continue to suffer serious damage to its reputation with doctors, patients, and the FDA. The FDA's refusal to file the leronlimab biologics license application, and its letter regarding Amarex's failure to file IND annual reports on CytoDyn's behalf, show that the FDA already has concerns about CytoDyn's ability to comply with FDA regulations, because of Amarex's failures as CRO. Such concerns from the FDA will certainly cause doctors and patients to be concerned, as well, also because of Amarex.

28. Good clinical practice and data integrity are the bedrock of a healthcare company, especially one like CytoDyn that is developing a novel, experimental treatment for deadly diseases.

29.     Doctors and their patients must be able to trust the companies that develop their medicines, and when a healthcare company's reputation for reliability and trustworthiness is tarnished, the consequences can be dire.

30.     If CytoDyn's clinical trials either shut down prematurely or are not properly monitored, its reputation will be damaged, because the FDA, doctors, and patients may not trust a company that cannot effectively manage its clinical trials—because of the failures of Amarex, its CRO—to develop safe and effective medicines for serious health conditions.

31.     CytoDyn has already and will continue to lose business opportunities without an injunction. For instance, because of Amarex's failures, CytoDyn has been unable to move quickly to develop leronlimab as a potential treatment for COVID-19, despite leronlimab's apparent anti-inflammatory properties and the highly publicized success of other monoclonal antibodies—the same kind of drug as leronlimab—as treatments for COVID-19.

32.     Other companies in the industry that would otherwise be willing to work with CytoDyn will stay away due to CytoDyn's association with Amarex and the collapse of CytoDyn's leronlimab program due to Amarex's mismanagement of the trials.

33.     The totality of CytoDyn's losses due to Amarex's breaches and torts will be so severe that they will cause CytoDyn to lose substantial shareholder value, the opportunity to attract future investment, and the company's reputation with the FDA, jeopardizing the company's ability to eventually obtain regulatory approval for leronlimab and thus threatening the very existence of the company.

34.     A setback of this magnitude in the company's only clinical program may make it very difficult for CytoDyn to continue to raise capital to fund its operations, and will place the prospect of FDA approval months if not years beyond CytoDyn's reach.

35. Amarex will suffer no harm should this Court require it to return CytoDyn's databases.

36. CytoDyn merely requests that Amarex comply with its contractual obligation.

37. If there is some administrative cost associated with providing CytoDyn access to its databases, CytoDyn is willing to pay that necessary administrative cost, as contemplated by the MSA.

Dated: 10/4/2021

*Nader Pourhassan*
Dr. Nader Pourhassan, Ph.D.

272734688