# EXHIBIT A



# Master Services Agreement

**THIS AGREEMENT** made and entered into on this XX$^{th}$ day of XXX, 2014 ("Effective Date") by and between Amarex Clinical Research, LLC, a for-profit Maryland limited liability company with its principle place of business at 20201 Century Boulevard, Germantown, MD 20874 ("Amarex") and CytoDyn Inc. ("CytoDyn") a corporation with its principle place of business at 1111 Main Street, Suite 660, Vancouver, WA 98660.

**WITNESSETH**

**WHEREAS**, CytoDyn is engaged in research and development of pharmaceutical products; and

**WHEREAS**, Amarex, a contract research organization, is engaged in the business of providing clinical trial management services and consulting; and

**WHEREAS**, Amarex desires to provide CytoDyn with certain clinical trial management services and consulting services as set forth herein, and CytoDyn desires to retain Amarex upon the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises and undertakings herein contained, the parties hereto agree as follows:

**SECTION 1**

**SERVICES**

**1.1** **Services**. Amarex agrees to provide certain clinical trial management services and consulting services (the "Services") to CytoDyn as the parties may agree in writing in a Project Work Order (each "Project Work Order"). Each Project Work Order, including each Project Work Order entered into prior to the Effective Date, is meant to be a part of this Agreement and is expressly incorporated into this Agreement by reference for all purposes. All prior Project Work Orders entered into before the Effective Date are identified in Exhibit A. A representative form of Project Work Order is attached as Exhibit B. Each Project Work Order must be in writing and signed by both parties before Amarex commences the applicable Services. In the event of a conflict between the terms of a Project Work Order and this Agreement, the terms of this Agreement will control unless the Project Work Order references the conflict and states that the language of the Project Work Order controls.

**1.2** **Amending a Project Work Order**. CytoDyn or Amarex may request changes in any Project Work Order (a "Change Proposal") by providing written notification of such changes to the other party. After the delivery of a Change Proposal, the parties will review the Change Proposal and negotiate in good faith any required changes to the related Project Work Order. If the parties reach agreement regarding the Change



Proposal, the parties will execute a new Project Work Order, which will modify referenced portions of the original Project Work Order.

1.3 **Project Manager**. Each Project Work Order will include primary contacts for both parties in connection with the performance of the Services (each a "Project Manager"). A Project Manager may be changed upon written notice to the other party.

## SECTION 2

## STANDARDS

2.1 **Performance of Services**. Amarex will perform the Services with due care and diligence in accordance with generally prevailing industry practices and standards and in accordance with all applicable laws and regulations and the terms and conditions of this Agreement and each Project Work Order.

2.2 **Time is of the Essence**. Amarex will perform the Services in an efficient and timely manner to achieve the timetables and milestones set forth in each Project Work Order. Amarex will notify CytoDyn in writing if it believes that there are likely to be substantial changes in any timetables or milestones contained in a Project Work Order. Such notice will include the reasons for changes to the schedule and will propose a new schedule. Amendments to a Project Work Order must be made in accordance with Section 1.2.

2.3 **Debarment**. Amarex hereby certifies that it is not a debarred or disqualified person or entity under the authority of the Generic Drug Enforcement Act of 1992, as amended, or any other law or regulation relating to the conduct of human research, and has not used and will take reasonable measures to avoid the use of services of any such debarred or disqualified person or entity in any capacity or connection with any of the services performed pursuant to this Agreement. This certification applies in respect of Amarex's colleagues, associates, agents and employees as well as third parties with which Amarex may subcontract. Amarex shall notify CytoDyn promptly in the event it or any such person or entity becomes subject to debarment or disqualification proceedings.

2.4 **Records; Audit Rights**. Amarex will maintain accurate, complete, and current records relating to all Services. Amarex will furnish to CytoDyn all data, information, and records maintained in connection with the Services as well as written reports of the process of the Services at reasonable times upon CytoDyn's request. CytoDyn shall be entitled, with at least 24 hours' prior notice, to audit and inspect records, facilities used, and the conduct of the Services relating to a Project Work Order under this Agreement. CytoDyn will not be responsible for payment to Amarex for time spent on audits.



## SECTION 3

## COMPENSATION AND PAYMENT

3.1 **Compensation**. CytoDyn agrees to pay Amarex the compensation for the Services as set forth in each Project Work Order.

3.2 **Invoices**. Amarex will invoice CytoDyn as set forth in each Project Work Order and payment is due thirty (30) days from the date of receipt of an invoice. All invoices and/or other requests for payment shall be itemized with a reasonable degree of specificity to ensure accuracy in accounting for the Services that were rendered and billed. All invoices and/or other requests for payment shall be sent to: Michael Mulholland at the address specified in Section 13. CytoDyn shall not be responsible for any invoices and/or other requests for payment sent to any address or department other than that provided immediately above. Payments to Amarex will be made out to Amarex Clinical Research, LLC (Tax ID: 52-2138315).

3.3 **Disputes**. Notwithstanding the foregoing, in the event CytoDyn in good faith disputes any invoice or portion thereof, within twenty-one (21) days of CytoDyn's receipt of the disputed invoice, CytoDyn will notify Amarex in writing with an explanation of the reasons for disputing the invoice, and payment of such invoice or portion thereof will not be due until the parties resolve such dispute, provided that CytoDyn will promptly pay the undisputed portion of any disputed invoice as set forth above. The parties shall negotiate in good faith to resolve any disputed amounts.

3.4 **Suspension of Services**. Amarex may suspend performance of all Services when any undisputed amount required to be paid by CytoDyn remains due and unpaid beyond the date such amount is due. If such unpaid amounts are not paid in accordance with Section 3.2, Amarex may terminate this Agreement and all outstanding Project Work Orders in accordance with Section 8.02. In addition, Amarex's obligations to release the results of data analysis for any Data Safety Monitoring Board Meetings, Interim analyses, and/or Final Analyses to CytoDyn shall be conditioned upon the fulfillment of all payment obligations from CytoDyn for Services; provided, however, that the results for the Data Safety Monitoring Board Meeting, Interim analysis, or Final Analysis are to be released up to and through the date of suspension, if paid for, whether or not such amounts are past the 30-day payment period.

3.5 **U.S. Dollars**. All invoices and/or other requests for payment shall be billable and payable in U.S. Dollars unless otherwise agreed upon in writing by both parties.

3.6 **Late Charges**. Except with respect to disputed invoices or amounts, Amarex may, at its option charge interest on the overdue account balance at the rate of 1.0% per month.



## SECTION 4

## CONFIDENTIALITY

**4.1** **Confidential Information**. For purposes of this Agreement "Confidential Information" means all information provided by or on behalf of one party (the "Disclosing Party") to the other party in connection with this Agreement and the Services including without limitation, all business information, pricing, proprietary software and programs, data, inventions, and information acquired or developed in or as a result of the performance of this Agreement, whether in oral, written, graphic or electronic form. Without limiting the generality of the foregoing, all Client Materials (as defined in Section 5.2) shall be deemed the "Confidential Information" of CytoDyn. Each party agrees, with respect to any Confidential Information disclosed to such party (the "Receiving Party") by the Disclosing Party hereunder: (a) to use such Confidential Information only for the purposes set forth in this Agreement; (b) only disclose Confidential Information to those employees, agents, and consultants who need to know and who are aware of their obligations under this Section 4; (c) to receive, maintain and hold the Confidential Information in strict confidence and to use the same methods and degree of care (but at least reasonable care) to prevent disclosure of such Confidential Information as it uses to prevent disclosure of its own proprietary and Confidential Information and to protect against its dissemination to unauthorized parties; (d) not to disclose, or authorize or permit the disclosure of any Confidential Information to any third party without the prior written consent of the Disclosing Party; and (e) except as needed to fulfill its obligations hereunder, to return or destroy any Confidential Information to the Disclosing Party at the request and cost of the Disclosing Party and to retain no copies or reproductions thereof, except that the Receiving Party may retain a single archival copy of the Confidential Information for the sole purpose of determining the scope of obligations incurred under this Agreement.

**4.2** **Exclusions**. The Receiving Party shall not be obligated to treat information as Confidential Information of the Disclosing Party if the Receiving Party can show by competent written evidence that such information: (a) was already known to the Receiving Party without any obligations of confidentiality prior to receipt from the Disclosing Party; (b) was generally available to the public or otherwise part of the public domain at the time of its disclosure to the Receiving Party; (c) became generally available to the public or otherwise part of the public domain after its disclosure, other than through any act or omission of the Receiving Party in breach of any obligation of confidentiality; (d) was disclosed to the Receiving Party, by a third party who was not under any obligation, direct or indirect, to Disclosing Party with respect to confidentiality or non-use; or (e) was independently discovered or developed by the Receiving Party without the use of or reference to the Disclosing Party's Confidential Information.

**4.3** **Disclosure Pursuant to an Order**. Notwithstanding Section 4.1, the Receiving Party may disclose Confidential Information, without violating its obligations under Section 4, to the extent the disclosure is required by a valid order of a court or other governmental body having jurisdiction; provided, however, that the Receiving Party gives reasonable



prior written notice to the Disclosing Party of such required disclosure in order to allow Disclosing Party, at its option, to seek a protective order preventing or limiting the disclosure and/or requiring that the Confidential Information so disclosed be used only for the purposes for which the law or regulation requires, or for which the order was issued.

**4.4** **Remedies**. The parties expressly acknowledge and agree that any breach or threatened breach of this Section 4 may cause immediate and irreparable harm to the Disclosing Party which may not be adequately compensated by damages. Each party therefore agrees that in the event of such breach or threatened breach and in addition to any remedies available at law, the Disclosing Party shall have the right to seek equitable and injunctive relief, without bond, in connection with such a breach or threatened breach.

**4.5** **Publicity**. All publicity, press releases, and other disclosures or announcements relating to this Agreement shall be reviewed in advance by, and subject to the approval of, both parties (which approval shall not be unreasonably withheld); provided, however, that either party may (a) disclose the terms of this Agreement insofar as required to comply with regulatory obligations as the sponsor of an IND, NDA, BLA, 510K, IDE, or PMA or applicable securities laws, provided that in the case of such disclosures the party proposing to make such disclosure notifies the other party reasonably in advance of such disclosure and cooperates to minimize the scope and content of such disclosure, and (b) disclose the terms of this Agreement to such party's investors, professional advisors or potential investors, acquirers, or merger candidates who are bound by obligations of confidentiality and non-use consistent with those set forth herein. The failure of a party to respond in writing to a publication proposal from the other party within five working days of such party's receipt of such publication shall be deemed as such party's approval of such publication as received by such party. Each party agrees that it shall cooperate fully and in a timely manner with the other with respect to any disclosures to the Securities and Exchange Commission and any other governmental or regulatory agencies, including requests for confidential treatment of Confidential Information of either party included in any such disclosure.

**4.6** **Survival**. All obligations of this Section 4 shall expire 3 years after the termination or expiration of this Agreement; provided, however, that Confidential Information which constitutes the trade secrets of a party if expressly labeled or identified as such by the Disclosing Party at the time of disclosure shall be kept confidential indefinitely, subject to the limitations set forth in Sections 4.2 and 4.3.

## SECTION 5

## OWNERSHIP OF CLIENT MATERIALS AND INTELLECTUAL PROPERTY

**5.1** **Deliverables**. "Deliverables" is defined as everything prepared by Amarex pursuant to this Agreement, including without limitation, reports, all materials, manuals, studies and all other documents.



**5.2 Ownership of Client Materials, Deliverables and CytoDyn's Confidential Information**. Except that Amarex shall own all rights, title and interest to any innovative methodology developed which has generic applications and is not specific to any particular CytoDyn Project, CytoDyn owns all right, title and interest, including all patents, copyrights, trademarks, and all other intellectual property or other proprietary rights, in and to all information, materials, documents and raw data (i) supplied to Amarex, including without limitation clinical data, in connection with this Agreement; (ii) developed by Amarex as a result of performing the Services, including without limitation any Deliverables; and (iii) CytoDyn's Confidential Information (all such information and materials, "Client Materials"). All Deliverables are works made for hire and Amarex hereby assigns all right, title and interest, including all patents, copyright, trademarks and any other intellectual property or other proprietary rights in the Deliverables to CytoDyn. Amarex will take all action reasonably requested by CytoDyn to vest ownership of any of the Deliverables in CytoDyn and to permit CytoDyn to seek patent, copyright, trademark or similar protection in its name.

**SECTION 6**

**DATA SECURITY AND RETURN OF CLIENT MATERIALS**

**6.1 Privacy.**

(a) Amarex will use Client Materials only for the purpose of fulfilling its duties under this Agreement and for CytoDyn's sole benefit, and will not share Client Materials with or disclose it to any third party without the prior written consent of CytoDyn or as otherwise required by law.

(b) All Client Materials will be stored on servers, located solely within the Continental United States.

**6.2 Data Security and Integrity**

(a) All facilities used to store and process Client Materials will employ commercial best practices, including appropriate administrative, physical, and technical safeguards, to secure such data from unauthorized access, disclosure, alteration, and use. Such measures will be no less protective than those used to secure Amarex's own data of a similar type, and in no event less than reasonable in view of the type and nature of the data involved. Without limiting the foregoing, Amarex warrants that all Client Materials will be encrypted in transmission (including via web interface) and storage at no less than 128-bit level encryption, and that Amarex will comply with all other technical specifications identified in writing by CytoDyn.

(b) To the extent applicable, the Services follow and comply with all regulatory guidelines for using controlled and secure computing environments with validated software and systems, including 21 CFR 11.

(c) Amarex will use industry-standard security tools and technologies such as anti-virus protections and intrusion detection methods in providing the Services under this Agreement

(d) Amarex will provide CytoDyn upon request the results of any security audits, scans and tests, and will promptly modify its security measures as needed based on those results in order to meet its obligations under this Agreement. CytoDyn may require, at its expense, Amarex to perform additional audits and tests, the results of which will be provided promptly to CytoDyn.

**6.3 Data Integrity**

Amarex will take commercially reasonable measures, including regular data integrity audits, to protect Client Materials against deterioration or degradation of data quality and authenticity.

**6.4 Response to Legal Orders, Demands or Requests for Client Materials**

(a) Except as otherwise expressly prohibited by law, Amarex will:

(i) immediately notify CytoDyn of any subpoenas, warrants, or other legal orders, demands or requests received by Amarex seeking any Client Materials;

(ii) consult with CytoDyn regarding its response;

(iii) cooperate with CytoDyn's reasonable requests in connection with efforts by CytoDyn to intervene and quash or modify the legal order, demand or request; and

(iv) upon CytoDyn's request, provide CytoDyn with a copy of its response.

(b) If CytoDyn receives a subpoena, warrant, or other legal order, demand or request seeking any Client Materials maintained by Amarex, CytoDyn will promptly provide a copy to Amarex. Amarex will promptly supply CytoDyn with copies of data required for CytoDyn to respond, and will cooperate with CytoDyn's reasonable requests in connection with its response.

**6.5 Data Compromise Response.**

(a) Immediately upon becoming aware of a Data Compromise, or of circumstances that could have resulted in unauthorized access to or disclosure or use of Client Materials, Amarex will notify CytoDyn, fully investigate the incident, and cooperate fully with CytoDyn's investigation of and response to the incident. Except as

otherwise required by law, Amarex will not provide notice of the incident directly to, regulatory agencies, or other entities, without prior written permission from CytoDyn.

(b) Notwithstanding any other provision of this Agreement, and in addition to any other remedies available to CytoDyn under law or equity, Amarex will reimburse CytoDyn in full for all costs incurred by CytoDyn in investigation and remediation of such Data Compromise, including but not limited to providing notification to third parties whose data were compromised and to regulatory agencies or other entities as required by law or contract; and the payment of legal fees, audit costs, fines, and other fees imposed by regulatory agencies or contracting partners as a result of the Data Compromise, provided that the Data Compromise was directly caused by Amarex gross negligence.

(c) For purposes of this Agreement, "Data Compromise" means a security-relevant event in which the security policy of a system used to create, transmit, maintain, use, process, or store data is disobeyed or otherwise breached, and in which Client Materials are exposed to unauthorized disclosure, access, alteration, or use.

**6.6 Retention and Disposal of Client Materials.**

(a) Using appropriate and reliable storage media, Amarex will regularly back up Client Materials.

(b) Amarex will immediately place a "hold" on the destruction under its usual records retention policies of records that include Client Materials, in response to an oral or written request from CytoDyn indicating that those records may be relevant to litigation that CytoDyn reasonably anticipates. Oral requests by CytoDyn for a hold on record destruction will be reduced to writing and supplied to Amarex for its records as soon as reasonably practicable under the circumstances. CytoDyn will promptly coordinate with Amarex regarding the preservation and disposition of these records. Amarex shall continue to preserve the records until further notice by CytoDyn.

**6.7 Transfer of Client Materials Upon Termination or Expiration.**

(a) Upon termination or expiration of this Agreement, Amarex will ensure that all Client Materials are transferred to CytoDyn or a third party designated by CytoDyn securely, within a reasonable period of time, not to exceed more than thirty (30) days. Amarex will ensure that such migration uses facilities and methods are compatible with the relevant systems of the transferee, and to the extent technologically feasible, that CytoDyn will have reasonable access to Client Materials during the transition.

(b) Amarex will notify CytoDyn of impending cessation of its business and any contingency plans in the event of notice of such a failure. This includes immediate transfer of any previously escrowed assets and data and providing CytoDyn access to Amarex's facilities to remove and destroy CytoDyn-owned assets and data. Amarex shall implement its exit plan and take all necessary actions to ensure a smooth transition of service with minimal disruption to CytoDyn. Amarex will provide a fully documented service



description and perform and document a gap analysis by examining any differences between its services and those to be provided by its successor. Amarex will also provide a full inventory and configuration of servers, routers, other hardware, and software involved in service delivery along with supporting documentation, indicating which if any of these are owned by or dedicated to CytoDyn. Amarex will work closely with its successor to ensure a successful transition to the new equipment, with minimal downtime and effect on CytoDyn, all such work to be coordinated and performed in advance of the formal, final transition date.

## SECTION 7

## TERM AND TERMINATION

**7.1** **Term.** This Agreement shall be effective from the date shown in the first paragraph on the first page and shall thereafter remain in full force and effect until terminated in accordance with this Section 7.

**7.2** **Termination for Convenience**. Either party may terminate this Agreement and/or any outstanding Project Work Orders by providing the other party with 30 days' prior written notice.

**7.3** **Termination – Opportunity to Cure**. Either party may terminate this Agreement and/or any outstanding Project Work Orders if, after 30 days' written notice, the other party fails to cure a material breach of any obligation, representation, or warranty in this Agreement and/or a Project Work Order.

**7.4** **Termination – Immediate.**

(a) Effective upon receipt, either party may terminate this Agreement immediately by giving written notice of that party's insolvency or bankruptcy or assignment for the benefit of its creditors, upon appointment of a trustee or receiver for the other party of all or substantially all of its property, or filing of a voluntary or involuntary petition by or against the other party under any bankruptcy or insolvency law, the reorganization or rearrangement provisions of the United States Bankruptcy Code, or any similar law.

(b) If this Agreement is terminated pursuant to this Section 7.4, Amarex shall be entitled to retain any sums paid to it by Cytodyn for Services and payment for Services performed but not yet paid.

**7.5** **Expiration**. If not sooner terminated, this Agreement will expire two years after the last to expire Project Work Order. Any payments due under this Section 8 shall be made within 30 days after termination.



**7.6    Effects of Termination.**

(a) Following termination pursuant to Section 7.2 or 7.3, Amarex will use commercially reasonable efforts to conclude outstanding Project Work Orders as expeditiously as possible, but in no event later than the termination date. In addition, Amarex shall use commercially reasonable efforts to eliminate further costs, and to cancel, if permitted under the terms of applicable agreements, any third party obligations. Except as agreed to in writing by CytoDyn, Amarex will not undertake any new Project Work Orders, incur expenses other than those required to conclude the outstanding Project Work Orders, or enter into further commitments after receiving or delivering such notice of termination. CytoDyn will compensate Amarex for Services actually performed and will reimburse Amarex for expenses actually and reasonably incurred in connection with winding up outstanding Project Work Orders, including without limitation work in progress and non-cancelable commitments with supporting documentation, through the date of termination. Notwithstanding the foregoing, if CytoDyn has paid for the Services in advance and such payment is in excess of the Services actually rendered, Amarex will refund CytoDyn the excess amount within 30 days after the completion of all Services. Within 30 days after the completion of all Services (which includes receipt by CytoDyn of any statistical analyses and other deliverables prepared by Amarex and paid for by CytoDyn, if any, prior to the date of termination), Amarex shall provide CytoDyn with a written itemized statement of all Services.

(b) If CytoDyn terminates this Agreement pursuant to Section 7.4, CytoDyn will compensate Amarex for Services actually performed and reimburse for expenses actually and reasonably incurred up to and including the date of termination.

(c) If CytoDyn terminates this Agreement pursuant to Section 7.2, Amarex shall be entitled to the amounts set forth in Section 7.5(a) plus ten percent (10%) of the remaining unbilled contract amount for Amarex's Services (i.e., non-passthrough related costs).

(d) Termination of this Agreement shall be without prejudice to any rights that shall have accrued to the benefit of either party prior to such termination, and shall not relieve either party of any obligations that have accrued to the other party prior to such termination or that survive such termination.



## SECTION 8

## INDEMNIFICATION

**8.1 Indemnification by CytoDyn**. CytoDyn will defend, indemnify and hold harmless Amarex and its directors, officers, employees, and agents (collectively, "Amarex Indemnitees") from and against all liabilities (including, but not limited to, personal injury or property damage), losses, costs, expenses (including reasonable attorneys' fees and court or arbitral tribunal fees and costs), penalties, fines, judgments, damages and/or amounts in settlement (collectively, "Losses") that may be incurred by the Amarex Indemnitees or asserted or claimed against the Amarex Indemnitees by one or more third parties solely to the extent and proportion such Losses: (a) arise from, or are attributable to (by judicial determination), any negligent or wrongful act or omission of CytoDyn or its employees in connection with this Agreement; or (b) result from any breach of this Agreement by CytoDyn, its directors, officers, employees, or agents. However, in no instance shall CytoDyn be responsible to any Amarex Indemnitee to the extent and proportion that such Losses are caused by any wrongful or negligent act or omission of any Amarex Indemnitee.

**8.2 Indemnification by Amarex**. Amarex will defend, indemnify and hold harmless CytoDyn and its directors, officers, employees, volunteers, and agents (collectively, "CytoDyn Indemnitees") from and against all liabilities (including personal injury or property damage), losses, costs, expenses (including reasonable attorneys' fees and court or arbitral tribunal fees and costs), penalties, fines, judgments, damages and/or amounts in settlement (collectively, "Losses") that may be incurred by the CytoDyn Indemnitees or asserted or claimed against the CytoDyn Indemnitees by one or more third parties solely to the extent and proportion such Losses: (a) arise from, or are attributable to (by judicial determination), any negligent or wrongful act or omission of Amarex or its employees in connection with this Agreement, the Services, or any Deliverables; or (b) result from any breach of this Agreement by Amarex, its directors, officers, employees or agents. However, in no instance shall Amarex be responsible to any CytoDyn Indemnitee to the extent and proportion that such Losses are caused by any wrongful or negligent act or omission of any CytoDyn Indemnitee.

**8.3 Procedure**. Any party seeking indemnification pursuant to this Section 8 (the "Indemnitee") shall promptly notify the other party (the "Indemnitor") in writing of any action, claim or other matter in respect of which such party, intends to claim such indemnification; provided, however, that failure to provide such notice within a reasonable period of time shall not relieve the Indemnitor of any of its obligations hereunder except to the extent the Indemnitor is prejudiced by such failure. The Indemnitee shall cooperate in the defense of such claim, proceeding or investigation, subject to reimbursement by the Indemnitor for all reasonable out-of-pocket expenses. The Indemnitor shall, at its option, assume control of the defense of any such claim, proceeding or investigation. The indemnities set forth in Sections 8.01 and 8.02 shall include amounts paid in settlement, provided, however, that no such settlement shall be entered into without the Indemnitor's consent, which consent shall not be unreasonably



withheld. In no event shall the Indemnitor compromise or settle any claim, proceeding or investigation in a manner that admits fault or negligence on the part of the Indemnitee, or that would otherwise adversely affect any rights of the Indemnitee, without the prior written consent of the Indemnitee. The Indemnitee shall have the right to retain separate legal counsel at its own expense.

**SECTION 9**

**LIMITED WARRANTY; REMEDY; LIMITATION OF LIABILITY**

**9.1** **Limited Warranty**. Amarex warrants that it shall provide the Services as set forth in Section 2.1.

**9.2** **Remedy**. CytoDyn's remedy for a breach of the warranty set forth in Section 9.1 is, at CytoDyn's option, either (a) re-performance of the applicable Services at no charge to CytoDyn or (b) return of the fees paid in connection with the applicable Services.

**9.3** **Limitation of Liability and Damage**. Except with respect to its indemnification obligations under Section 8, under no circumstances shall Amarex be liable to the CytoDyn or any third party claiming by or through CytoDyn as a result of Amarex's failure to perform the Services, for any consequential, indirect, or special damages, and the warranty set forth in Section 9.1 is in lieu of any and all other warranties relating to the Services, express or implied, including, without limitation, any implied warranties of merchantability or fitness for a particular purpose, or for non-infringement of intellectual property rights. In no event shall Amarex be responsible or liable for an aggregate damage total in excess of the value paid by CytoDyn for the Services under the applicable Project Work Order giving rise to damages; provided, however, that this limitation does not apply in the event of Amarex's gross negligence or willful misconduct or in the event of Amarex's material breach of the confidentiality provisions of this Agreement.

**SECTION 10**

**INSURANCE**

**10.1** While a Project Work Order is outstanding, Amarex must maintain a policy or policies of comprehensive general liability, in a minimum amount of $1,000,000 per occurrence and $3,000,000 in the aggregate with respect to personal injury, bodily injury, and property damage. Upon request, Amarex will submit certificates of such insurance policy to CytoDyn. If CytoDyn desires that Amarex carries insurance in excess of what Amarex currently maintains, CytoDyn will be responsible for the cost of that additional insurance.



## SECTION 11

## RELATIONSHIP OF PARTIES

**11.1 Independent Contractor**. Amarex shall perform services under this Agreement only as An independent contractor and nothing contained herein shall be construed to be inconsistent with that relationship or status. Amarex and its consultants and subcontractors shall not be considered employees or agents of CytoDyn. This Agreement shall not constitute, create or in any way be interpreted as a joint venture, partnership or business organization of any kind.

## SECTION 12
## NON-SOLICITATION

**12.1** Neither party shall, during the term of this Agreement, and for a period of twelve (12) months following expiration or termination thereof, without the prior written consent of the other party, for itself or on behalf of or through any third party, directly or indirectly, solicit to employ or engage as an independent contractor, any employee or consultant of the other party who was in any way involved in rendering or receiving Services under this Agreement or any Project Work Order. Notwithstanding the above, the following shall not be prohibited: (a) any solicitation if, at the time of such solicitation, the individual is no longer employed by the other party as an employee or independent contractor for reasons not associated with pursuing a future business or employment relationship with the soliciting party; (b) solicitations initiated through general newspaper advertisements and other general circulation materials, including web-based postings, not directly targeted at such individuals; and (c) solicitations of such individuals who have first contacted either party on their own initiative, directly or through third party recruiters, regarding employment or engagement as an independent contractor.

## SECTION 13
## NOTICE

**13.1 Routine Communications**. All routine communications provided for in this Agreement shall be sent via first class mail (subject to Section 13.2 below), postage prepaid, addressed to the respective parties as follows:

**To Amarex:**

**Kazem Kazempour**
President and CEO
Amarex Clinical Research, LLC
20201 Century Boulevard, Suite 450
Germantown, MD 20874

**To CytoDyn:**

**Michael Mulholland**
Chief Financial Officer
CytoDyn Inc.
1111 Main Street, Suite 660
Vancouver, WA 98660



**13.2** **Required Communications**. Other than routine correspondence, any communication required under this Agreement shall be sent by certified mail, return receipt requested, and addressed to the respective parties at the addresses set forth in Section 13.1 above. Such notices shall be effective upon receipt.

**SECTION 14**

**NO ASSIGNMENT**

**14.1** Neither party may assign any rights this Agreement or any of its rights or obligations hereunder without the prior written consent of the other party.

**SECTION 15**

**MISCELLANEOUS**

**15.1** **Entire Agreement; Amendment**. This Agreement constitutes the entire agreement between the parties on the subject matter to be described and defined in future Project Work Orders and supersedes all prior contracts, agreements and understandings relating to the same subject between the parties. The parties intend this Agreement to be a complete statement of the terms of their agreement and no change or modification of any of the provisions of this Agreement shall be effective unless it is in writing and signed by a duly authorized officer of Amarex and CytoDyn.

**15.2** **Counterparts**. This Agreement may be signed in any number of counterparts, which, when taken together, will constitute one and the same Agreement.

**15.3** **Governing Law**. This Agreement shall be governed by the laws of the State of Maryland, U.S.A.

**15.4** **Dispute Resolution**. The parties will make a reasonable effort to resolve any claims which they may have against each other by good faith negotiation. A party's failure to make such an effort, however, will not be a prerequisite to its right to arbitrate. All claims arising under or relating to this Agreement, including any claims created by statutory law, will be decided by final and binding arbitration. The arbitration will be held in Baltimore, Maryland, and will be conducted according to the applicable rules of Commercial Arbitration Rules of the American Arbitration Association, using a panel of one arbitrator who will be selected in accordance with such rules. This provision will provide the exclusive means for dispute resolution, provided, however, that neither party will be prohibited from proceeding in a court to seek injunctive relief or other equitable remedies pending arbitration. The parties will share equally in the costs of any arbitration, but a prevailing party will be entitled to receive, as a part of the award, its reasonable arbitrator and attorney fees incurred in connection with the arbitration as provided in Section 15.5. Judgment on an arbitration award may be entered by any court having jurisdiction.

**15.5** **Attorney Fees**. In any arbitration or litigation concerning this Agreement, including



without limitation any proceeding under the U.S. Bankruptcy Code, the prevailing party will be entitled to recover all reasonable costs and expenses of arbitration or litigation, including reasonable attorney fees at arbitration, at trial, and on any appeal or petition for review. For purposes of this Agreement, "prevailing party" means the party that prevails (whether affirmatively or by means of a successful defense) with respect to claims having the greatest value or importance as reasonably determined by the arbitrator or court.

**15.6** **Force Majeure**. Neither party shall be deemed in breach of its obligations, if such failure or delay is due to, and only for so long as there exists, natural disasters or any other causes reasonably beyond the control of the parties.

**15.7** **Severability**. The invalidity or unenforceability of any term or provision of this Agreement shall not affect the validity or enforceability of any other term or provision of this Agreement.

**IN WITNESS THEREOF**, the parties have executed this Agreement as of the Effective Date.

| **For and on behalf of CytoDyn Inc.:** | | **For and on behalf of Amarex Clinical Research, LLC:** | |
|---|---|---|---|
| Print Name: | Nader Pourhassan | Print Name: | Kazem Kazempour |
| Signature: | | Signature: | |
| Title: | President and CEO | Title: | President and CEO (Member) |
| Date: | | Date: | |

EXHIBIT A

Outstanding Project Work Orders as of the Effective Date

1. Project Order [CD104]_Substitution, dated________, 2014.
2. Project Order [CD105], dated___________, 2014.
3. Project Order CD102_IB, as amended on October 9, 2013.

EXHIBIT B

Form Project Work Order

See attached.