```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
2                        SOUTHERN DIVISION

3
   CYTODYN, INC.,                      )
4                                      )
              Plaintiff,               )
5                                      ) Case Number: 8:21-cv-2533-PJM
              vs.                      )
6                                      )
   AMAREX CLINICAL RESEARCH, LLC       )
7  and NSF INTERNATIONAL, INC.,        )
                                       )
8             Defendants.              )

9
              TRANSCRIPT OF PROCEEDINGS - MOTION HEARING
10            BEFORE THE HONORABLE PETER J. MESSITTE
                 UNITED STATES DISTRICT JUDGE
11            TUESDAY, OCTOBER 12, 2021; 2:30 P.M.
                     GREENBELT, MARYLAND
12

13                 A P P E A R A N C E S

14  FOR THE PLAINTIFF:

15      SIDLEY AUSTIN LLP
              BY:  JACQUELYN ERIN FRADETTE, ESQUIRE
16            BY:  LUCAS W.E. CROSLOW, ESQUIRE
              BY:  BENJAMIN M. MUNDEL, ESQUIRE
17            1501 K STREET NW
              WASHINGTON, DC 20005
18            (202) 736-8822

19  ALSO PRESENT: Julie Timmer and Margaret Lindgard

20      ***Proceedings Recorded by Mechanical Stenography***
         Transcript Produced By Computer-Aided Transcription
21  _____

22            MARLENE KERR, RPR, RMR, CRR, FCRR
                 FEDERAL OFFICIAL COURT REPORTER
23               6500 CHERRYWOOD LANE, STE 200
                   GREENBELT, MARYLAND 20770
24                      (301)344-3499

25
```

1                          A P P E A R A N C E S
                                   Continued
2

3

 FOR THE DEFENDANT:
4
        MILES and STOCKBRIDGE PC
5               BY:  RACHEL THEORA McGUCKIAN, ESQUIRE
                11 N WASHINGTON STREET, SUITE 700
6               ROCKVILLE, MARYLAND 20850
                (301) 762-1600
7
        HOWARD and HOWARD ATTORNEYS PLLC
8               BY:  JON ROBERT STEIGER, ESQUIRE
                BY:  PATRICK McCARTHY, ESQUIRE
9               450 W 4TH STREET
                ROYAL OAK, MICHIGAN 48067
10              (248) 723-0407

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                         P R O C E E D I N G S

2              (Call to Order of the Court.)

3                  THE COURT:  This is Judge Messitte here.

4          Counsel for Plaintiff, CytoDyn, would you identify

5     yourselves, please.

6                  MS. FRADETTE:  Hi, Your Honor.  This is Jacquelyn

7     Fradette from Sidley Austin on behalf of Plaintiff.  With me

8     are my colleagues Mark Hopson, Ben Mundel, and Lucas Croslow

9     who have filed their Pro Hac Vice motion.

10                 THE COURT:  Okay, the second name I didn't catch;

11    Mark?

12                 MS. FRADETTE:  Mark Hopson.

13                 THE COURT REPORTER:  Can I get the spelling of that

14    last name, please?

15                 MS. FRADETTE:  Sure.  H-o-p-s-o-n.

16                 THE COURT:  Okay.

17         And for Defendant Amarex Clinical?

18                 MS. McGUCKIAN:  Good afternoon, Your Honor.  Rachel

19    McGuckian for the defendants, and with me is Julie Timmer, who

20    is the Chief Legal Officer for the defendants; Margaret

21    Lingard, L-i-n-d-g-a-r-d, who is an Assistant General Counsel;

22    and then I have Patrick McCarthy and Jon Steiger from Howard

23    and Howard who were both admitted Pro Hac Vice earlier today.

24                 THE COURT:  Very good.

25         Are you going to be speaking for Amarex, Ms. McGuckian?
```

1          MS. McGUCKIAN:  Yes, Your Honor.

2          THE COURT:  All right.

3      And Ms. Fradette, you for CytoDyn?

4          MS. FRADETTE:  My colleague, Ben Mundel, will be

5  speaking for CytoDyn today.

6          THE COURT:  All right, very good.

7      Well, have you folks had any discussions since the papers

8  got filed?

9          MR. MUNDEL:  We have not.

10          THE COURT:  You have not.

11      Well, let me address this to you then, Mr. Mundel.  What

12  do you want the Court to do at this point?  I mean, I know you

13  asked for a preliminary injunction, which usually comes with a

14  little workup on the other side before you simply go, you know,

15  bing, bang, and enter a preliminary injunction.  What are you

16  seeking right now?

17          MR. MUNDEL:  Yes, Your Honor.  We think that this

18  case is relatively straightforward.  If I can just give you a

19  little bit of a brief background between the parties, my

20  client, CytoDyn, contracted with Amarex to run its clinical

21  trials, and Amarex is currently running four clinical trials

22  that have patients enrolled in them today.

23      The relationship between these parties broke down, and

24  there is a dispute over money.  Amarex says CytoDyn owes it

25  money.  CytoDyn says Amarex -- you know, vice versa.  So we are

1    in arbitration to work out the financial dispute between the

2    parties.

3         The reason that we are in court is because Amarex is

4    holding hostage the clinical trial data that CytoDyn owns for

5    the ongoing clinical studies that are in process today.  So

6    what we are seeking is a preliminary injunction that allows my

7    client, CytoDyn, to have access to that clinical trial data so

8    it can maintain the integrity and the safety of those clinical

9    trials and also the right to audit Amarex's past work so that

10   CytoDyn can report to the FDA or IRBs anything that needs to be

11   reported based upon what's going on previously with those

12   clinical trials.

13        So --

14             THE COURT:  Let me ask, are you -- well, don't go too

15   far along here because I haven't heard even any kind of

16   responsive filing from the defendant.

17        But are you claiming that in any way the quality of the

18   clinical trials has been compromised?

19             MR. MUNDEL:  Yes, Your Honor.  We believe that the

20   work on the clinical trials that Amarex was contractually

21   obligated to do, that it has not done.  Most notably, it has

22   not monitored the clinical trials to ensure that clinical trial

23   sites were following the protocol, and it has not ensured that

24   the data was maintained in the way that it needs to be

25   maintained for FDA approval.

1      That is --

2          THE COURT:  Okay, not too much further along here.  I

3  have had nothing responsive at all from the defendant yet.  So

4  I don't want you to go on at length about your position.

5      Let me hear from Ms. McGuckian on where you are as of

6  today.

7          MS. McGUCKIAN:  Thank you, Your Honor.

8      I think if you take a scan through both the complaint and

9  the motion, it screams patient safety, patient safety, patient

10  safety, and I don't think you heard Mr. Mundel mention patient

11  safety at all, and I'm glad to hear that because this is not

12  about patient safety.

13      The safety of an individual patient is the responsibility

14  of the treating physician or the investigator.  What Amarex

15  does is it's a high level not on the ground, you know, clinical

16  trial facilitator.  So what Amarex does is it takes the

17  information that the doctors and hospitals, these third-parties

18  with which CytoDyn contracts to conduct the actual

19  on-the-ground physical trials with patient contact, takes the

20  information and, you know, the papers from the doctors and

21  hospitals that are doing the clinical trials and what they

22  do -- I thought the general counsel, when I got a good

23  explanation, said it really well, which is it's essentially

24  taking a huge pile of papers and creating an Excel Spreadsheet

25  and organizing everything and putting all the information in

1    there and maybe doing some statistical analyses and things like

2    that.

3        So, you know, so it's not just -- what the plaintiff is

4    talking about isn't quite what the issues are.  So that's one

5    thing in response.

6        So what CytoDyn wants is to take the material that we have

7    prepared and not pay for it.  So at this point, it's not a

8    money issue back and forth.  It's a money issue going one way.

9    So I think the bill is up to close to $12 million that CytoDyn

10   owes and wants our work product without paying for it, and

11   they're trying to get that through the vehicle of this

12   mandatory injunction to provide data that we've assembled.

13       I think what's important to note is all of the raw data

14   that we've assembled and collated and, essentially, you know,

15   put in these Excel Spreadsheets -- and that's just -- it's not

16   Excel Spreadsheets but that's the analogy -- is available to

17   CytoDyn now.  It's with the third-party sites.  So if they want

18   the information and they need it for their clinical trials or

19   for their reporting or whatever, they have it.

20       So, you know, it's a whole lot of nothing.  It's just a

21   grab to get the MacGuffin, I would say, and not pay for it.

22   That's what's going on here.

23               MR. MUNDEL:  If I may, Your Honor?  This is --

24               THE COURT:  Is this Mr. Mundel responding?

25               MR. MUNDEL:  Yes.

1          THE COURT:  You're on the record, so the court

2    reporter has to know who's talking.  Go ahead.

3          MR. MUNDEL:  Thank you.

4        This absolutely is all about patient safety, and that's

5    the reason that we are here because in order to monitor the

6    safety of these clinical trials where patients with HIV and

7    liver disease are receiving this drug, we need the database to

8    monitor it.  Without the data, the company can't accurately

9    monitor what's going on.

10         If there is a safety incident at one of the sites, we have

11   no way of looking at the historic records to see what occurred,

12   what needs to be reported to the physicians, what needs to be

13   reported to the FDA.

14         So this data is absolutely crucial to protect the safety

15   of the patients in the studies and the ongoing integrity, and

16   the FDA has been clear about that issue.

17         Second --

18         THE COURT:  All right, let me stop you a minute,

19   Mr. Mundel.  You're talking about why you need it.  Do you owe

20   money to Amarex?  Are you saying you don't owe any money or

21   what?  What's your position on that?

22         MR. MUNDEL:  We do not owe any money to Amarex.  We

23   believe Amarex actually owes us money, but all of that is going

24   to be resolved in the arbitration.  There is a mandatory

25   arbitration clause about the money.

1      So, you know, before this started, Amarex was holding the

2  data hostage because they wanted to force my client to pay

3  first before it got the data, and we said, well, we have --

4          THE COURT:  Stop.  I need to stop you because you go

5  a little farther than I need to know, and I need to sort of

6  break this down into comprehensible segments.

7      Has the arbitration commenced, Mr. Mundel?

8          MR. MUNDEL:  We have a call with a case management

9  officer set for the 22nd of October.

10          THE COURT:  All right.  Are you before the AAA?  Who

11  are you before?

12          MR. MUNDEL:  Yes, Triple A.

13          THE COURT:  Okay.  And you don't have any kind of

14  date set other than to have an initial call.  Is that correct?

15          MR. MUNDEL:  Correct, Your Honor.

16          THE COURT:  All right.

17      Ms. McGuckian, are you in that arbitration for your

18  client?

19          MS. McGUCKIAN:  I have not entered my appearance,

20  Your Honor.

21          THE COURT:  Do you anticipate --

22          MS. McGUCKIAN:  Possibly, Your Honor, but my

23  co-counsel on the call will definitely be in that arbitration.

24          THE COURT:  Who would that be?

25          MS. McGUCKIAN:  That's Mr. McCarthy and Mr. Steiger

1    from Howard and Howard.

2           THE COURT:  Okay.

3           Well, it's a rather odd circumstance to hear the

4    plaintiffs say that we owe nothing, you owe us money, and the

5    defendant say, no, you owe us $12 million.  I mean, it's got

6    kind of a ridiculous quality to it.

7           And the reality of arbitration is you won't get a quick

8    response from the arbitration.  I assume each side appoints an

9    arbitrator and the two appoint a third and then you have a

10   hearing with evidence and go back and forth, much like a trial,

11   and you wouldn't get a resolution on the monetary issue

12   probably for sometime within a year if you're doing well.  So

13   that's the reality of arbitration.

14          And it may well be that in the interim some kind of

15   preliminary court relief is in order.  So that's the way I

16   approach it.  I don't see that the arbitration is going to

17   speed along in any way.

18          Now, there really is a serious issue, Mr. Mundel, and

19   Plaintiff, by you getting one side.  You get the data and they

20   get zero until the resolution is there.  And it's problematic.

21   It's problematic.

22          And I hear you say that you think that there is a possible

23   compromise in quality in whatever Amarex is supposed to be

24   doing for you, and that may well be.

25          Ms. McGuckian, how do I scope that out?  How do I know

1   whether what you folks are doing, what you're continuing to do,

2   what you think needs to be done under of the contract, you're

3   doing it at an appropriately qualitative level?

4           MS. McGUCKIAN:   Your Honor, the $12 million has

5   been -- it's not all new invoices but this has creeped along

6   for a while where Amarex has repeatedly said you need to pay

7   us, and if you don't, then we're going to stop giving you

8   access to this database.

9       And I do want to correct one thing that Mr. Mundel said,

10  which is they don't have access to the data.  CytoDyn has

11  absolutely access to every bit of medical information and

12  clinical information.  They are all on the site.  They could

13  easily recreate this database if they wanted to in a matter of

14  days, but they prefer to have it all wrapped up in a nice

15  package and handed to them for free.

16      So this $12 million is real money.  It's real invoices for

17  real work, and I guess the only way to solve that is if we're

18  dealing with Triple A, which, as you know, can take longer than

19  things take in the District of Maryland.  It's probably, you

20  know, a 65-D bond that would cover that $12 million.  I think

21  that's the only way that we can see to protect this rather than

22  just giving something away with no hope of getting paid for it,

23  which is really what would happen if this mandatory injunction

24  was issued and made us turn something over that they don't

25  have.

1          I also just want to mention -- I'm sorry, go ahead.

2          MR. MUNDEL:  No, you go ahead.

3          MS. McGUCKIAN:  Okay.  You know, this wasn't

4    completely cut off.  Amarex has maintained -- so there is

5    reporting that goes on between the clinical trials, the sites,

6    up to Amarex, and CytoDyn has agreed to continue to pay for

7    Amarex to receive these SAE reports you'll see referenced to in

8    the papers.  And so we'll notify CytoDyn if there is an adverse

9    report that requires some FDA reporting as a practical matter.

10   I think it's happened once that a need for an FDA report in the

11   four clinical trials that are going on now had to be made.

12   But, you know, we'll continue to do that.  I think that CytoDyn

13   has acknowledged that.

14          We've also agreed to continue the patient -- the medical

15   monitoring.  So if a question comes to us, we will provide

16   answers in support.  Again, their CEO said they would pay for

17   it.  So we haven't just pulled the rug out from under them in

18   any way.  This is a long time coming.  This is a big bill that

19   continued to grow that wasn't paid, and, you know, you can kind

20   of see this Hail Mary, this request for mandatory injunction

21   that we'll be able to really articulate much better than I'm

22   doing now in our opposition papers.

23          THE COURT:  How long do you think it will take you to

24   file a written opposition?

25          MS. McGUCKIAN:  We think we can get it done by

1   October 26th.  It involves -- there are people that are

2   traveling, and it involves getting affidavits.  So we think,

3   you know, we can get it done as early as October 26th.

4          THE COURT:  Okay.

5      Now, in the interim, Ms. McGuckian, what happens between

6   now and the 26th?  Do you just keep --

7          MS. McGUCKIAN:  Yep, we'll keep the status quo.

8          MR. MUNDEL:  Your Honor --

9          THE COURT:  Wait a minute.  The status quo requires,

10  though, continuing activity on your client's part, right?

11         MS. McGUCKIAN:  The status quo -- so CytoDyn no

12  longer has access to the EDC, which is the Electronic Data

13  Capture, or to the databases that are for all 22 clinical

14  studies that have gone on under our watch.  It's kind of

15  interesting.  You know, if you compare what the motion has and

16  then what the order that they request at the end of the

17  preliminary injunction motion, they want access to all of the

18  databases for all of these clinical trials, all 22, plus this

19  EDC.

20     So they don't have access to it now.  They haven't had

21  access to it since the third week of September.  So we wouldn't

22  allow them access to that, but the most important things that

23  they seem to complain about, the concern about the SAE

24  reporting and, you know, the ability to notify the FDA when

25  there is a problem, and also the patient -- the medical

1  monitoring.

2       So if a question comes to Amarex, we will provide answers.

3  We will agree to continue that.  And, you know, we would want

4  them to represent, as their CEO did, that they would pay for

5  those services.

6                 THE COURT:  Mr. Mundel?

7                 MR. MUNDEL:  Yes.  Thank you, Your Honor.

8       The question that you started this off with was a very

9  important question that is the basis for our preliminary

10  injunction.  The reason we filed this motion is because Amarex

11  sent a letter to CytoDyn and a letter to the hospitals and

12  doctors saying that it was suspending its activities monitoring

13  the safety and the obligations of the clinical trial sites.  So

14  they told us that, and they told the trial sites that.

15       So they stopped doing what they were contractually

16  obligated to do and that's why we --

17                 THE COURT:  Do I have a copy of that letter -- stop

18  where you are.  Do I have a copy of that letter?

19                 MR. MUNDEL:  Let me just confirm that it was attached

20  to our preliminary injunction motion, Your Honor.

21                 THE COURT:  Well, all right.

22                 MR. MUNDEL:  I don't think it was submitted, but we

23  can submit it to Your Honor.

24                 THE COURT:  All right, go ahead.  Keep talking.

25                 MR. MUNDEL:  So they told us and the trial sites that

1  they were suspending all activities.  So that is why we need --

2  the status quo as of now is them doing absolutely nothing, and

3  we can't do the monitoring that needs to be done because they

4  have taken away the access to the data that we need to do the

5  monitoring.  So that's why the injunction is something that is

6  urgent, because the status quo is simply untenable.

7          THE COURT:  Mr. Mundel, answer me this, though.  I'm

8  looking at the Document 69 that was filed earlier in the case,

9  and it's got invoices going back to early June of 2020, and

10  you're saying that no payment of any sort is due on any of

11  those invoices?  Is that correct?

12          MR. MUNDEL:  Yes, Your Honor.  Well, let me answer it

13  this way.  CytoDyn has paid more than $80 million on -- to

14  Amarex for its work.  Our investigation has shown a substantial

15  amount of the work that we have paid for has not been done.  So

16  that is why we think the net will be in favor of Amarex paying

17  CytoDyn a refund of the portion of the $80 million that was

18  paid.

19      And to be clear, this data, it is -- the contract makes no

20  -- says that CytoDyn owns that data no matter what.  It has

21  nothing to do with whether we pay or not.  That data is ours.

22  It must be returned.  The whole payment thing will be worked

23  out separately as part of the arbitration, but under the plain

24  terms of the contract, CytoDyn owns the clinical data, and

25  there is no basis for them to withhold that data from us.

1          THE COURT:  Now, why do you think, Mr. Mundel, a

2    judge looking at a case for the first time should accept your

3    version of the proposition that they owe you money; you don't

4    owe them money?  This is a classic dispute over a fee.  Why do

5    I give you, apparently, cost free, that's what you're telling

6    me -- because you do face the possibility of a huge bond in

7    this case.  Why should I opt in favor of you on the basis of a

8    preliminary pleading?

9          I mean, I could ask you to post a $12 million bond.  And

10   you may get it back.  It's going to cost you something to put

11   it up, but right now I don't know whether they owe you the

12   money or not.  I know that there is a contract for them to give

13   you product.  Ordinarily when someone needs product, you pay

14   for it.

15         Now, the suggestion that the people to whom submitted the

16   product owes you money kind of hits a tin ear on this end.  I

17   mean, it's not the way things usually go, but if you are

18   willing to stand on your -- the veracity or the belief of the

19   veracity of your view, then you've got to be prepared to post a

20   very substantial bond.  I think you need to see that, because

21   the proposition you're quoting is just unrealistic, the idea

22   that they should continue to work for you while you get money

23   back from them just doesn't seem to hit a reasonable note.

24   That's what I'm hearing from you.

25         MR. MUNDEL:  Yes, Your Honor.  This is Mr. Mundel

1    again for the court reporter.

2        Two responses.  The first is we are prepared to have the

3    who owes who money worked out in arbitration.  That's why we

4    have filed for arbitration, so the arbitrator can decide, and

5    that doesn't have to be a predecessor issue for this Court to

6    decide.  The only thing that the Court has to decide is whether

7    we can access the data during this interim period to protect

8    the safety of the patients while Amarex is refusing to conduct

9    that safety or give us the data.

10       Second, under the contract, this is not data that they --

11   it's not their data.  The data is our data.  The contract says

12   that CytoDyn owns the information, materials, documents, or raw

13   data that is developed as a result of performing the services

14   in this contract.  So the data is ours.

15       They don't have to give us -- there is data analysis and

16   other work product they have done.  They don't have to give us

17   any of that.  What we're asking for is access to the database

18   so that we can see what the patients are doing, how they are

19   doing, and be able to report to the FDA.

20           THE COURT:  Ms. McGuckian, do you want to respond?

21           MS. McGUCKIAN:  Your Honor, this will be very clear

22   on our opposition papers, and I hate to say it for the third

23   time, but they have all of the data.  All of the data that

24   they're saying they need is with their sites, and they have

25   separate contracts with each of the site providers, which are

1  doctors and hospitals.  If they want the data, all they need to

2  do is retrieve it from their sites.

3       They're asking for our work product, and I also dispute

4  the idea that somebody owns something that they don't pay for,

5  and that's what they're saying here.

6       So, you know, number one, they have access to all of the

7  data they need; number two, they shouldn't be given all of our

8  work product when they didn't pay for it.  So that's on that.

9       And, you know, I would also like to just point out that

10  this is a request for a mandatory preliminary injunction.  They

11  want our work without paying for it, and so, you know, there is

12  a higher standard there, and it's generally disfavored, and

13  this should be something that's resolved in arbitration and who

14  owes who what.

15            THE COURT:  Well, let me ask you a question.  What

16  kind of bond would you be looking for?  Let me pose it

17  differently.  If I were to impose a substantial bond of the

18  order of what you claim is due your client, would you be

19  willing to go along with all of the requested relief on a

20  preliminary basis that Plaintiff is asking for?

21            MS. McGUCKIAN:  If it was the $12 million -- you

22  know, whatever the actual amount of the invoices due, plus the

23  cost of the continued monitoring going forward, I think that is

24  something we would be willing to do.

25       You know, we have some concerns about this company as a

1   result of some investigations going on.  So, you know, we would

2   absolutely insist on having the security that 65(c)

3   contemplates in exactly a situation like this.

4            THE COURT:  What do you mean by the cost of the

5   continuing monitoring?  Who would be doing what?

6            MS. McGUCKIAN:  So if we turn over the EDC and the

7   databases -- and, again, they're asking for much more than are

8   related to these four current patient trials.  They're asking

9   for the other 18 that are already finished and reported, but we

10  are continuing so far to monitor the patient -- we're doing

11  patient monitoring.  So if a question comes in from a site or

12  from someone that's conducting the on-the-ground clinical

13  trial, we provide answers in support for that.

14           We also, if a site reaches out to us for SAE reporting, so

15  if there is some adverse effect of something that needs to be

16  reported by the site to us, we will pass that information on to

17  CytoDyn, and they can tell the FDA if they need to.  If there

18  is a connection between the drug and the outcome, they will

19  report it to the FDA.

20           Again, these are kind of minor things just because that

21  hasn't happened.  I think one time where something was

22  reportable to the FDA on those four studies.  But we'll do

23  that.  I think that's, you know, that's less -- it's whatever

24  is in the invoices.

25           So they can't be expecting for us to continue without

1  working.  So I think it's fair to say that the 12 million-odd

2  dollars that are owed now, plus whatever similar -- you know,

3  whatever the cost might be, and we can certainly provide that

4  at the injunction hearing, for another year while the Triple A

5  arbitration on goes.

6          THE COURT:  Let me ask you a question.  Is there any

7  role for an impartial third-party agent -- agency to intervene

8  on an interim basis to preserve the integrity of the data, to

9  do the monitoring so that there isn't a concern on Plaintiff's

10  side that the defendant is doing something substandard or vice

11  versa?  I'm asking that to you, Ms. McGuckian.

12          MS. McGUCKIAN:  Well, I think it goes back down to

13  that the safety and the monitoring of these individual patients

14  is done on the ground with the treating physicians or the

15  investigators.  You know, it doesn't come from us.  So all we

16  do is we take that information and we put it into our system.

17  So, you know, they would have the ability to -- assuming they

18  post the bond and they do all of that, then we'll continue

19  business as usual.

20      They used to have access to that information, and, you

21  know, it's kind of rather late that they're making complaints

22  where they've had access to the information all the time, and

23  it's only when their bills kind of started to add up that they

24  started to complain about quality.  So they'll have that same

25  access assuming a bond is posted.

1          THE COURT:  Mr. Mundel.

2          MR. MUNDEL:  Yes, thank you, Your Honor.

3     As to the third-party point, I think that is a good one

4  and one that we have proposed.  We have a third-party new

5  contract research organization that can do the work that Amarex

6  is supposed to do lined up and ready to go.  So they don't have

7  to give us access to the data if they don't want to, but they

8  at least need to give this third-party, CRO, access to the data

9  so they can monitor the existing trials and make sure that the

10 safety is being overseen.  So we could do it with a third-party

11 so that it doesn't come to us.

12     The second point that I would just like to respond to is

13 we keep hearing that the data is all available at these

14 clinical trial sites, and it's not a big deal; we can get the

15 data now; we can get the data now.  If that's the case, then

16 our ask is not a big deal.

17     You know, what they're saying is basically we have access

18 to it.  So why are they fighting us, not giving us access to it

19 if the data is all available?  It's very clear that this is

20 something that we need to protect the integrity and safety of

21 these trials, and if Amarex's position is it's all available,

22 then they should give it to us.

23          THE COURT:  I gather --

24          MR. MUNDEL:  And the third point if I may --

25          THE COURT:  Go ahead.

1        MR. MUNDEL:  Oh, no, go ahead, Your Honor.

2        THE COURT:  I want to know something about this

3   third-party.  I gather you have -- your client has some

4   relationship with him or anticipates a relationship with him?

5        MR. MUNDEL:  Yes.  When the relationship with Amarex

6   broke down, we immediately did our research to find the

7   replacement third-party CRO and have found one that is

8   qualified and competent.  They are ready to hit the ground

9   running, but they need access to the database in order to hit

10  the ground running.  So, yes, we have them lined up.  They are

11  ready to go as soon as we get the data.

12       THE COURT:  Where are they?  Who are they and where

13  are they?  You said CRO.  It doesn't register with me.

14       MR. MUNDEL:  Their name is Symbio, S-y-m-b-i-o, and

15  they are based in -- I'll tell you in one second here.  I

16  believe they are based in New York, Port Jefferson.

17       THE COURT:  All right.  And your suggestion is that

18  they would simply take over data that is currently in the hands

19  of Amarex and then continue to monitor the information

20  thereafter?

21       MR. MUNDEL:  Correct.  My understanding is it's very

22  simple, that the data is being hosted in the cloud, that a

23  third-party service is currently hosting the data.  And all we

24  want to do is have us or our third-party, Symbio, take over

25  that contract of hosting the data so they can have access to

1    the data.

2         So we do not need anything ongoing from Amarex.  The

3    relationship could end as soon as we get the data.

4              THE COURT:  Well, that might put you in breach of

5    your contract, though, right?  I don't know whether you're

6    rightly or wrongly terminating Amarex at this point.  You may

7    be breaching the contract yourself and opening up your client

8    to substantial damages for breach of contract.

9              MS. McGUCKIAN:  Your Honor, on that point, I'll jump

10   in --

11             THE COURT:  Wait a minute.  Who is talking?

12             MS. McGUCKIAN:  I'm sorry, Your Honor.  Rachel

13   McGuckian.

14             THE COURT:  All right.

15             MS. McGUCKIAN:  And I just wanted to say we don't

16   need to continue the relationship.  We just want to get paid

17   for the work that we've done.  So if they want the information

18   to give on the follow-along contract, that's fine but they need

19   to pay for it first.

20        It's the same problem.  It's not simply an independent

21   third-party.  They are looking for their next CRO.  We're a

22   CRO.  They won't pay us.  We don't want to do work for free.

23             THE COURT:  What does CRO stand for?

24             MS. McGUCKIAN:  It stands for contract research

25   organization.  It's basically a, you know, clinical trials

1    company.

2          THE COURT:  Well, okay.  I think I see where we are.

3    All right, folks, here's my sense, and you'd better give it

4    some serious thought and start talking to each other in a

5    reasonable way.

6          I'm going to impose, Mr. Mundel, a substantial bond on

7    your client to get the kind of relief that you want.  Now,

8    whether it's 12 million or thereabouts, we'll see, but I do

9    believe that it's a sort of a pay-as-you-go system.

10         And the idea that you now dispute that work wasn't done or

11   too much was charged, that's the kind of stuff I hear day in,

12   day out now for, what, 36 years.  There is nothing unique about

13   that proposition.

14         So to have you say you're entitled to product and not pay

15   for it falls on deaf ears on this side.  So be prepared to post

16   a very substantial bond.

17         Here's what I ask you to do, Ms. McGuckian, in response.

18   I want you to propose -- I want you to say all the things that

19   you said here now, that your client is prepared to abide by

20   certain conditions and to turn over the data, even to this

21   third-party, whatever they are.  Again, their name escapes me

22   at the moment, but that you're prepared to do it, that you now

23   have a basis for demanding the payment of the thereabouts $12

24   million.

25         I have the invoices but I can't tell much more.  I

1    probably need a little more detail from the defendant, from

2    Amarex on just what these services are, and if there is some

3    correspondence that comes in on a continuing basis from the

4    plaintiff saying this is not owed, we're not going to pay, and

5    so on, I would like to see that as well.

6         But I am prepared, as I say, to go along with what --

7    apparently Amarex is willing to go along with the termination

8    of the relationship as long as they get paid for what they've

9    done, and as long as there is a bona fide dispute as to what is

10   due, there will be, as there would be with any kind of

11   preliminary injunction, a bond component, and in this case, it

12   could be quite substantial.

13        So you come back, Ms. McGuckian, with your response and

14   what you're prepared to do, what precisely the amount of bond

15   that you seek, and it may as well -- it may well be that the

16   amount of the bond should include some component for the cost

17   of the arbitration, which may or may not be covered by it.  It

18   doesn't mean that in the end Plaintiff will be required to pay

19   anything, but they may be required to pay a substantial amount

20   against the bond.

21        So that's where we stand at this point.  I need to see the

22   written response from the defendant.  I don't really need to

23   have a hearing.  It's not really -- it sounds to me like the

24   defendant is willing to go along with the requested relief as

25   long as a substantial bond is imposed.  Am I correct in saying

1  that, Ms. McGuckian?

2        MS. McGUCKIAN:  That's my understanding, and I invite

3  anybody else on my side to weigh in with a contrary thought.

4  Apologies, Your Honor.

5        THE COURT:  All right.  Well, you need to think it

6  through, but that's where we are if there is no dispute,

7  although we have to have a hearing on the preliminary

8  injunction.  It's strictly for the amount of the bond, and, for

9  that purpose, I just need a little more substance on how the

10  invoices do demonstrate at least a bona fide demand for payment

11  for services rendered, and that would then lead to the

12  imposition of the bond.

13     You'll, of course, have a chance to respond, Mr. Mundel,

14  to whatever the defendant does.

15     I need to be clear, though, that in the next -- between

16  now and the 26th, Ms. McGuckian, things will continue a pace,

17  and if there's any potential compromise, then we need to

18  make -- you know, we'll provide for something while we provide

19  for something.  I mean, we need to take care of the next two

20  weeks.

21     So what do we do in that case, Ms. McGuckian?

22        MS. McGUCKIAN:  Well, we'll continue -- you heard

23  that October 8th drop-dead date.  Well, we didn't drop dead on

24  October 8th.  We've continued to -- you know, on the SAE

25  reporting and on the patient medical monitoring.  So we'll send

1    a confirmatory letter to CytoDyn in that regard.  So that's the

2    status quo --

3              THE COURT:  That needs to be appended to your

4    response as well so that I know that the interim is covered.

5    But then, from that point forward, again, to the extent that

6    you're prepared to concede the requested relief, then you give

7    me the basis for calculating the amount of the bond that might

8    be due.

9              MS. McGUCKIAN:  Well, we're not necessarily -- I'm

10   sorry, Your Honor.

11             THE COURT:  Go ahead.

12             MS. McGUCKIAN:  We're not necessarily prepared to

13   concede that they're entitled to the relief at all.  There are

14   a lot of, you know, I'll say misrepresentations in the papers,

15   including that there are, you know, blind studies that are

16   implicated.  Well, there are no blind studies going on, there's

17   no placebos, and there are a lot of other kind of mistakes on

18   what type of information.

19        So, you know, I think we'll focus more on the bond issue,

20   but we certainly don't want to leave misrepresentations

21   standing, and we will make an argument about why a preliminary

22   injunction is not appropriate here.

23             THE COURT:  The question is going to be, though, with

24   the imposition of the bond, what are they entitled to do?

25             MS. McGUCKIAN:  Okay.

1          THE COURT:  Are they going to continue to withhold,

2     or is it a matter of making factual statements that counteract

3     statements that are made by the plaintiff?  I mean, you need to

4     be clear about that because if your position is I want a

5     substantial bond and we still aren't going to go along with

6     what they want, then there's no basis for imposing the bond, is

7     there?  I mean --

8          MS. McGUCKIAN:  Well, that --

9          THE COURT:  Go ahead.

10          MS. McGUCKIAN:  I hear you, Your Honor.  Yes, I know

11     exactly -- I know what you're saying.

12          THE COURT:  I mean, you've got to be clear about

13     that.  Again, specifically, if you want to counteract certain

14     assertions, the best way to do that is you can say, While we

15     disagree with A, B, C, we're prepared to allow 1, 2, 3, and 1,

16     2, 3 should be the substantial relief that they're asking for.

17          If not, then I think we have to make some

18     other provisions, including, for example, is there going to be

19     a need for a preliminary injunction hearing.  I mean, that

20     really is where I come out on this.  Or is this the kind of

21     thing that sorting through it, we can make a decision.

22          And, again, as I say, with regard to the amount of the

23     bond, as long as there is a bona fide basis for claiming

24     delivery of product and non-payment, that's going to be enough

25     to justify the imposition of the bond.  Really, I can see that

1   there are invoices rendered.

2        I'm not really sure how more meticulous I can be about

3   whether the work was done or was it done well or whatever.

4   That really awaits the merits.  This is simply to provide that

5   you get short-term relief in a way that plaintiffs are seeking,

6   but they also are faced with a substantial financial outcome if

7   they can't make good on their claim.

8        Mr. Mundel, I've spoken a lot with Ms. McGuckian.  I want

9   to hear from you now.

10            MR. MUNDEL:  Your Honor, that sounds like a practical

11  and good path forward.  I do think it would be good to get some

12  clarity from the defendants whether this is a path they are

13  willing to take, or are we going to need to have a PI hearing

14  on the merits to dispute the merits.  We would like to know

15  that quickly so we can prepare a path forward, but I do think

16  that this is, perhaps, a practical and easy way to get to a

17  resolution here more quickly.

18            THE COURT:  Here's why, I mean, you've got until --

19  I'll give you until the 26th, Ms. McGuckian, to file your

20  response, and then we'll say ten days after for Plaintiff to

21  reply; and I need to be clear, Ms. McGuckian, and you need to

22  be clear whether you are seeking some sort of further hearing

23  in the matter, what it is you're willing to give and what it is

24  you're willing not to give and why that would still justify the

25  imposition of a bond in some amount, which I'll let you argue

1   for and then at least give the plaintiff ten days thereafter to

2   counteract anything you say.

3          And in both cases, I need to know are we looking for a

4   preliminary injunction hearing on any of this or are we not.

5   In the end, this looks to be like a reasonably straightforward

6   dispute over money.  It may be that the num sum or all of the

7   amount that the defendants are claiming is due, but that's what

8   happens in these cases.

9          But there is an ongoing relationship or at least there is

10  a relationship where the data needs to be protected, and we're

11  not going to let one hold the other hostage.  That's why you

12  have bonds.

13         So that said, we'll send out a notice that Defendant's

14  written response will be due on the 26th, and then ten days

15  thereafter, whatever the first business day thereafter, we will

16  have a reply from the plaintiff, and we'll see whether a

17  further hearing is necessary.  I don't think it is but we'll

18  see.

19         All right.  Anything else, Counsel?

20             MS. McGUCKIAN:  Yes, Your Honor, two matters.  One is

21  that one of the defendants is NSF International, which appears

22  one time in the Complaint at paragraph 4.  It doesn't appear

23  anywhere else.  It's misrepresented as the owner of Amarex.  I

24  don't -- I prefer not to waste the time filing a motion to

25  dismiss that defendant when there is no basis for that

1  defendant to be in here in the first place.  So I wanted to

2  raise that to see whether -- you know, what the plaintiff's

3  position is on that, whether it's necessary.  They are not a

4  party to the arbitration.

5         MR. MUNDEL:  We would be happy to discuss that

6  information with the defendant.  If they can give us that

7  information, we would be happy to discuss it.

8         THE COURT:  All right.  I think that's fair enough.

9  Fair enough, Ms. McGuckian.  You take that sort of outside this

10 conference and talk to Mr. Mundel about putting them out of the

11 case.

12     What else?

13        MS. McGUCKIAN:  There is one other matter with some

14 information on costing and pricing that was included in the

15 publicly filed exhibits for redaction and seal.  Do you want me

16 to deal offline with him as well on that?

17        THE COURT:  Say that again.

18        MS. McGUCKIAN:  So there is Exhibit D to the

19 Complaint and Exhibit B to the motion that include costing and

20 pricing information that's proprietary.

21        THE COURT:  Is there a motion to seal on that

22 pending?

23        MS. McGUCKIAN:  No.  They were filed without a motion

24 to seal, and we just noticed it so --

25        THE COURT:  Well, are you asking that they be sealed,

1  certain exhibits?

2        MS. McGUCKIAN:  Yes, I would ask that exhibit -- Your

3  Honor, I make a motion that Exhibit D to the Complaint and

4  Exhibit B to the motion for preliminary injunction be sealed.

5        THE COURT:  Any objection to that, Mr. Mundel?

6        MR. MUNDEL:  No objection, Your Honor.

7        THE COURT:  All right.  We'll enter an order to that

8  effect.

9     Anything else?

10       MS. McGUCKIAN:  Nothing else, Your Honor.  Thank you.

11       THE COURT:  All right, folks.  Start talking.  All

12  right, thank you.

13       MR. MUNDEL:  Thank you, Your Honor.

14       MS. McGUCKIAN:  Thank you, Your Honor.

15       MS. FRADETTE:  Thank you, Your Honor.

16    (The proceedings were adjourned at 3:12 P.M.)

17

18    I, Marlene Kerr, FCRR, RPR, CRR, RMR, certify that the

19  foregoing is a correct transcript of the stenographic record of

20  proceedings in the above-entitled matter.

21

22                Dated this 14th day of October, 2021.

23

24                        /s/
                       Marlene Kerr
25              Federal Official Court Reporter