UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| CYTODYN, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No.: 8:21-cv-02533-PJM |
| AMAREX CLINICAL RESEARCH, LLC, *et al*., | ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

Defendants Amarex Clinical Research, LLC ("Amarex") and NSF International ("NSF"), by their attorneys, Rachel T. McGuckian, Miles & Stockbridge P.C., Jonathan R. Steiger, Patrick M. McCarthy and Howard & Howard Attorneys PLLC, hereby oppose Plaintiff CytoDyn, Inc.'s ("CytoDyn") Motion for a Preliminary Injunction, and in support thereof state as follows:

**I.      INTRODUCTION**

With the merits of this case to be resolved at arbitration, CytoDyn brings this lawsuit for preliminary injunctive relief in an effort to obtain Amarex's services and work data compilation without paying. But CytoDyn is in default on approximately $14 Million in unpaid invoices and interest for work already provided by Amarex and is not entitled to the relief it seeks. CytoDyn does not satisfy the elements justifying an injunction, let alone the high standard of "indisputably clear" entitlement to relief required for a mandatory injunction. Although CytoDyn raises the specter of "patient safety" as a hook to obtain the extraordinary relief it seeks, as set forth *infra*, no patient safety issues exist. CytoDyn's request for a preliminary injunction must be denied.

Alternatively, to the extent this Court enters an injunction, CytoDyn should be required to: (1) post security of in the form of a standby letter of credit of $15,927,920 pursuant to Federal Rule of Civil Procedure 65(c), consisting of $13,927,920 in unpaid invoices and interest, and $2,000,000 in legal fees and costs for arbitration; and (2) prepay on an ongoing basis the fees/costs associated with the continuing services of Amarex, as necessary to comply with any mandatory injunction and/or as selected by CytoDyn, at the rates set forth in the respective Work Orders and the Master Services Agreement.[1]

## II. STATEMENT OF FACTS

Amarex has been providing trusted and valuable clinical trial management and consulting services to CytoDyn pursuant to a Master Services Agreement ("MSA") and numerous Work Orders since 2013. Dkt. No. 6-4, Ex. A to CytoDyn Mot. for PI, § 1.1[2]. The MSA requires Amarex to invoice CytoDyn for services performed, that CytoDyn notify Amarex of any dispute within twenty-one days of receipt, and if no dispute is raised, that CytoDyn must pay the invoice within thirty days of receipt. *Id.*, §§ 3.2, 3.3. Under the MSA, Amarex may "suspend performance of all Services" in the event CytoDyn fails to pay an undisputed invoice. *Id.*, § 3.4.

The parties worked well together for several years, and as recently as July 2020 CytoDyn's CEO publicly praised Amarex and its executive leadership for work "done spectacularly for" CytoDyn. **Exhibit 1**, Kazempour Decl. ¶ 28 and its Ex. H. Despite Amarex's lauded contract performance, as CytoDyn's investor support dried up and its operational cash flow deteriorated, CytoDyn stopped paying Amarex's invoices. Specifically, starting in July 2019, CytoDyn failed

---

[1] Amarex attempted to resolve the security and continued services issues with CytoDyn, to no avail.
[2] The version of the MSA attached as Exhibit A to CytoDyn's Motion for Preliminary Injunction is unsigned, and does not constitute the full agreement of the parties on all terms. Because, however, the additional or different terms in the operative agreement do not implicate any issues here, Amarex will cite to CytoDyn's exhibit.

to pay certain Amarex invoices that were not disputed. Exhibit 1, Kazempour Decl. ¶ 9 and its Ex. A. As time went on, the number of unpaid (but not timely disputed) invoices multiplied. As of October 22, 2021, CytoDyn owed Amarex $13,261,982.62 in unpaid invoices, along with $665,937.60 in contractual interest, which remains unpaid to date. *Id.*

After its extensive efforts to convince CytoDyn to pay its outstanding obligations failed, and after years of unpaid invoices piled up, warnings went unheeded and ample notice was given, Amarex invoked Section 3.4 of the MSA and suspended certain services. Amarex did not cut CytoDyn off "cold turkey," as the Complaint falsely alleges. Exhibit 1, Kazempour Decl. ¶ 13. In suspending certain services, Amarex made clear that it would still be willing to perform limited services to monitor ongoing trials for CytoDyn, so long as CytoDyn paid for the work. Dkt. No. 6-9, Ex. F to CytoDyn Mot. for PI, August 2 letter from Amarex's Counsel to CytoDyn.

Rather than pay the invoices without prejudice while the arbitration proceeds, or attempt to resolve the dispute amicably otherwise, CytoDyn filed its motion for a preliminary injunction and argued that without *free* continued access to Amarex's databases and without certain of Amarex's services (none of which it is willing to pay for), patient safety is at risk. CytoDyn's "patient safety" argument is without foundation, as set forth in the Declarations of Dr. Daniel Hanley, Jr. of John Hopkins (**Exhibit 2**), and Amarex's Kazem Kazempour (Exhibit 1). Dr. Hanley, a renowned expert with extensive clinical trial experience, attests in support of this Opposition that "there are no issues of, or threats to patient safety, arising from the actions of Amarex as alleged by CytoDyn." Exhibit 2, ¶ 9. Dr. Hanley also makes clear that patients in CytoDyn's four remaining clinical studies *are managed and treated by doctors*, and that "the doctors [not Amarex] are identifying and as needed, treating adverse effects, and the doctors [not

Amarex] are continuing to enter, monitor, and maintain the medical and other records" for each patient. Exhibit 2, ¶ 10.

Further to this Court's guidance, Amarex confirmed by letter dated October 22, 2021 that medical monitoring associated with serious adverse events ("SAE") has continued, uninterrupted:

> Amarex confirms it has not stopped and will continue medical monitoring activities associated with SAE reporting until the earlier of the resolution of the preliminary injunction proceedings or CytoDyn advises that it no longer needs Amarex to perform these activities. For clarification, Amarex will perform these activities in the same manner as it has been since September 24, and EDC access will not be restored. The sites may continue to report any SAEs by sending the SAE Notification Form to Amarex via email or fax or by contacting Amarex via phone. In the event a site reports a SAE to Amarex, the Amarex team will notify CytoDyn. Amarex will continue to invoice CytoDyn for these activities and CytoDyn shall provide timely payment for the same.

(Exhibit 1, Kazempour Decl. at Ex. B).

### III.  APPLICABLE LAW

#### A.  Standard for Mandatory Preliminary Injunctive Relief

CytoDyn and Amarex agree that, to succeed on even a prohibitory preliminary injunction, CytoDyn:

> must make a clear showing (1) that [it is] likely to succeed on the merits; (2) that [it] will suffer irreparable harm that is neither remote nor speculative but actual and imminent if the injunction is not granted; (3) that the balance of equities favors [its] position, i.e., that the harm Plaintiff[] will suffer if the injunction is not granted outweighs the detriment Defendant[] will suffer if it is and; (4) that the relief [it] seek[s] is in the public interest.

*HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 679 (D. Md. 2020). A heightened standard is applied when a party seeks a mandatory preliminary injunction, which "alter[s] the status quo." *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 235–36 (4th Cir. 2014). CytoDyn is asking the Court to order Amarex to restore data access and order Amarex to submit to an audit, which relief is in the form of a mandatory injunction and therefore "'disfavored,' and should only be granted where 'the applicants' rights to relief [is] indisputably clear.'" *Nat'l Public Radio, Inc. v. Klavans*, No.

21-2247, 2021 WL 4197661, at *3 (D. Md. Sept. 15, 2021) (quoting *Mtn. Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019)). Because CytoDyn's right to relief is anything but indisputably clear, the Court must deny the preliminary injunction.

### B. Security Must Be Provided If An Injunction Issues

Pursuant to Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Rule 65(c)'s security requirement "is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Yan Plastics Corp.*, 147 F.3d 411, 421 (4th Cir. 1999). "Although the district court has discretion to set the [security] amount in such sum as the court deems proper, it is not free to disregard the bond requirement altogether. In view of the clear language of Rule 65(c), failure to require a bond upon issuing injunctive relief is reversible error. *Id*. (citations omitted).

### IV. ARGUMENT

CytoDyn has not demonstrated that it is entitled to a preliminary injunction, let alone made the "undisputedly clear" showing required under the law. And even if the Court grants a preliminary injunction, pursuant to Fed. R. Civ. P. 65(c), as set forth *infra*, CytoDyn must be required to post security in the form of a stand-by letter of credit of at least $15,927,920, plus prepayment on an ongoing basis for continuing services.

### A. CytoDyn is Not Likely to Succeed on the Merits

As set forth above, CytoDyn must show that it has an "indisputably clear" right to relief on its claims for breach of contract, conversion and trespass to chattels. *Klavans*, 2021 WL 4197661, at *3. With respect to its breach of contract claim, CytoDyn alleges that Amarex breached the

MSA by failing to turn over full access to data in its possession, and by failing to allow CytoDyn access to audit and inspect Amarex's records and facilities. Pl's Mem. of Law in Support of Mtn. at 14–17.  Under Maryland's "first material breach" rule, CytoDyn cannot succeed on the merits, because it was first to breach the agreement by failing to pay close to $14 Million in unpaid invoices and interest. *See Fromm Sales Co. v. Troy Sunshade Co.*, 222 Md. 229, 233 (1960); *Shapiro Eng'g Corp. v. Francis O. Day Co.*, 215 Md. 373, 379 (1958) ("where one party has materially breached a contract, the other party is no longer obligated to perform."); *Nat'l Micrographics Sys., Inc. v. OCE-Indus., Inc.*, 55 Md. App. 526, 545–46 (1983) (citations omitted) ("One party may not recover from another party under a contract unless the former has performed or is ready and willing to perform.")

Here, CytoDyn materially breached the MSA by failing to make payments on numerous work orders over the past two plus years. Exhibit 1, Kazempour Decl. ¶¶ 9-13 and Ex. A.  As of October 22, 2021, CytoDyn owes Amarex $13,261,982.62, plus additional contractual interest of $663,294.82 for services already provided. *Id.*  This "failure to make payments under an agreement such as this indubitably constitutes a material breach in the absence of a showing of justification or excuse." *Fromm Sales Co.*, 222 Md. at 233.  No justification exists when CytoDyn claims, long after the fact and despite that it was contractually obligated to dispute an invoice within 21 days of receipt, that Amarex was not providing adequate services while at the same time asking that such services be restored, in full. Exhibit 1, Kazempour Decl. ¶¶11-13.

As to CytoDyn's claims for conversion and trespass to chattels, both tort claims fail because this is a straightforward breach of contract case.  With respect to CytoDyn's conversion claim, "Maryland courts have made clear 'mere failure to perform under a contract is not enough' to maintain an action for conversion and 'a positive, tortious act' distinct from the breach of the

6

contract term is indispensable." *Anne Arundel Cty. v. Xerox State & Local Sol.'s, Inc.*, No. 16-00563, 2016 WL 5720705, at *10 (D. Md. Sept. 30, 2016) (quoting *Fink v. Pohiman*, 85 Md. App. 106, 114 (1990)). Similarly, CytoDyn cannot succeed on its trespass to chattels claim because the "economic loss doctrine 'prohibits a plaintiff from recovering in tort for purely economic losses—losses that involve neither a clear danger of physical injury or death, nor damage to property other than the product itself.'" *Pacific Indem. Co. v. Whaley*, 572 F. Supp. 2d 626, 628 (D. Md. 2008) (quoting *Morris v. Osmose Wood Preserving*, 340 Md. 519, 530 (1995)). The purpose behind the economic loss doctrine is to "prevent[] a plaintiff from 'pasting an ill-suited tort label on a set of facts that supports nothing more than a breach of contract claim.'" *Nat'l Labor College v. Hillier Grp. Architecture New Jersey, Inc.*, 739 F. Supp. 2d. 821, 832 (D. Md. 2010). Because this entire dispute arises from crossclaims of breach contract between the parties, CytoDyn cannot succeed on tort claims for either conversion or trespass to chattels.

    **B.**    **CytoDyn Has Not Established Irreparable Harm**

CytoDyn's argument that patient safety is at risk because it does not have access to "EDCs" related to the ongoing studies (*see* Pl's Mem. of Law in Support of Mtn., p. 18, 20) is factually baseless. EDC stands for "electronic data capture," and refers to a compilation of extracted summary data from a clinical study. *See* Exhibit 3, Hanley Decl. ¶¶ 8, 12. Importantly, an EDC "is ***not for patient treatment***, but rather is a web based digital tool that captures select data for use by a sponsor or [clinical research organization] in an after-the-fact analysis of risk benefit to be presented to the FDA in the mandated regulatory pathway to new drug approval." *Id.* at ¶ 12. The EDC has nothing to do with patient safety; it is Amarex's valuable work product, which CytoDyn attempts to obtain for free.

Dr. Hanley could not be clearer on this point: "there are no issues of, or threats to patient safety, arising from the actions of Amarex as alleged by CytoDyn." *Id.* at ¶ 9. Patients involved in clinical studies—including the ongoing studies here—are managed and treated by doctors. *Id.* at ¶ 10. "[T]he doctors are identifying and as needed, treating adverse effects, and the doctors are continuing to enter, monitor, and maintain the medical and other records" for each patient. *Id*. The medical records created by doctors are then generally collected by a clinical research organization (Amarex, in this case) through different types of processes, including written case reports or an electronic data capture system ("EDC"). *Id*. at ¶¶10–12. The patients' doctors "utilize the actual clinical records to treat their patients." *Id*. at 11. Information within an EDC system is "not for patient treatment." *Id*. at ¶ 12. For patient safety, "[m]edical professionals caring for a trial participant have independent access to clinical source records." *Id*. at ¶ 13. Aside from medical professionals, trial sponsors (CytoDyn, in this case) and clinical resource organizations (like Amarex) "have access to all actual clinical source medical records" as well. *Id*.

Further, "[a]n EDC system is not necessary for receipt, monitoring or resolution of a serious adverse event ("SAE") occurring in a patient." *Id*. at ¶ 14. Rather, SAEs "must be documented in the clinical records and source documents. Thus, the absence of access to the EDC does not impair patient safety." *Id*. If a SAE arises, the event is documented in clinical records or source documents, and then a notification the sponsor (CytoDyn) and/or the clinical research organization (Amarex). *Id*. Amarex has made it expressly clear, through a letter to CytoDyn's counsel dated October 22, 2021, that medical monitoring associated with serious adverse events ("SAE") has not stopped and is continuing. Exhibit 1, Kazempour Decl. at Ex. B.

CytoDyn makes the generic allegation that patient safety will be impacted if it becomes necessary to "unblind" the study to determine if a participant is taking the experimental medication

or a placebo. Pl's Mem. of Law in Support of Mtn. p. 23.  Such allegation is remarkable, given that *all four of the ongoing trials that Amarex and CytoDyn are currently working on are unblind* and "no patient is receiving a placebo at this time." Exhibit 1, Kazempour Decl. ¶ 30.  According to Dr. Hanley, there is "no unblinding or emergency need to unblind a patient" "[i]f all patients in the trial are receiving the actual experimental drug." Exhibit 2, Hanley Decl. ¶ 16.

CytoDyn also focuses on potential harm to itself, but any potential "harm" it might suffer is of its own doing:  CytoDyn failed to pay, or even dispute, more than $13 million of unpaid invoices.  Any potential "harm" could easily be resolved through other means, *i.e.*, CytoDyn paying what is owed.  *See Ohio-Sealy Mattress Mfg. Co. v. Duncan*, 486 F. Supp. 1047, 1054–55 (N.D. Ill. 1980) ("In addition, *Schafer* observed that the extreme remedy of a preliminary injunction might not be necessary in a case where there were available other means of avoiding the anticipated harm.").  CytoDyn can simply pay Amarex for the outstanding unpaid invoices that were not timely disputed, and then obtain the data it seeks, disputing the bills in the pending arbitration proceeding.  CytoDyn can similarly avoid the harm it fears, including loss of goodwill and reputation, by simply paying the outstanding invoices.  Accordingly, any "harm" that CytoDyn claims is not only not irreparable, but also self-inflicted and could be remedied by CytoDyn.

Finally, CytoDyn makes a passing argument that Section 4.4 of "the parties' agreement alone supports a finding of irreparable harm." Dkt. No. 6-1, Pl's Mem. of Law in Support of Mtn. p. 19.  This argument is a misstatement of the MSA, which is standard contract language in which "[t]he parties expressly acknowledge and agree that any breach or threatened breach of ***this Section 4*** may cause immediate and irreparable harm." Dkt. No. 6-4, Ex. A to CytoDyn Mot. for PI, MSA, Section 4.4 (emphasis added).  The "irreparable harm" provision of the agreement is expressly limited to Section 4, and Section 4 deals with confidentiality only. *Id.*, Section 4.

In sum, CytoDyn cannot establish that it will face irreparable harm absent a preliminary injunction. In fact, any "harm" CytoDyn alleges is self-inflicted and can be remedied by CytoDyn. If CytoDyn wants to avoid this entire issue it can simply pay Amarex the money owed, and deal with any disputes in the pending arbitration. There is no irreparable harm under the circumstances.

C. **The Balance of Hardships and Public Interest Require Denial of CytoDyn's Motion for Preliminary Injunction**

As CytoDyn cannot establish the essential likelihood of success or irreparable harm elements, Amarex will only briefly address the remaining elements—balance of hardships and public interest. CytoDyn focuses its "balance of hardships" argument around Amarex allegedly not complying with the MSA, but "[c]ompliance with a pre-existing legal obligation cannot fairly be considered a hardship." *See Trs. of Heating, Piping, & Refrigeration Pension Fund v. Clean Air Mech., Inc.*, No. 17-3690, 2019 WL 2146916, at *5 (D. Md. May 16, 2019). CytoDyn's public interest argument focuses on purported patient safety, which lacks factual basis as set forth, *supra*. And, on balance, CytoDyn has not paid Amarex approximately $14,000,000.00 due and owing, which outweighs CytoDyn's request for additional free services at Amarex's expense. The harm to Amarex outweighs any harm to CytoDyn which, as explained, CytoDyn can easily remedy.

D. **If the Court Grants a Preliminary Injunction, It Must Impose Adequate Rule 65(c) Security**

In the event the Court finds that CytoDyn has met its burden of proof and the mandatory preliminary injunction requiring Amarex to grant CytoDyn access to the EDC databases, and to allow CytoDyn to perform an audit is issued, substantial security under Federal Rule of Civil Procedure 65 is necessary.

A court considering the security requirement "'should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers

as a result of an improvidently issued injunction.' The bond amount, therefore, 'ordinarily depends on the gravity of the potential harm to the enjoined party.'" *Brightview Group, LP v. Teeters*, 441 F. Supp. 3d 115, 144 (D. Md. 2020) (quoting *Hoechst Diafoil Co., supra,* 174 F.3d at 421 n.3)). As the Fourth Circuit instructed in *Hoechst Diafoil*:

> the judge usually will fix security in the amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period he is prohibited for engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained.

*Id*. (quoting 11A Charles Alan Wright, et al., *Federal Practice & Procedure* § 3954, at 292 (2d ed. 1995)).

To the extent this Court determines to enter an injunction, CytoDyn should be required to: (1) post security of in the form of a standby letter of credit of $15,927,920[3] pursuant to Federal Rule of Civil Procedure 65(c), consisting of $13,927,920 in unpaid invoices and interest, and $2,000,000 in legal fees and costs for arbitration (**Exhibit 3**, McCarthy Decl.); and (2) prepay to Amarex on an ongoing basis the fees/costs associated with the continuing services of Amarex, as necessary to comply with any mandatory injunction and/or as selected by CytoDyn, at the rates set forth in the respective Work Orders and the Master Services Agreement. This amount, 15,927,920, is an appropriate amount as the sum certain of damages Amarex will suffer by being forced to turn over its work product to CytoDyn without being compensated for prior work. *See Roxul USA, Inc., v. Bd. of Educ. of Cnty. of Jefferson*, No. 19-cv-54, 2019 WL 2016866, at *7 (N.D. W. Va. May 7, 2019) (Court set a bond at $3.5 million and granted defendant leave to file a motion for reconsideration because it "was not prepared with a sum certain concerning the damages it may

---

[3] The condition for payment to Amarex on the standby letter of credit shall be the earliest to occur of: (1) a net arbitration award in favor of Amarex, in which case payment shall be made to Amarex via the standby letter of credit in an amount equal to the sum of the net arbitration award to Amarex up to the full $15,927,920; or (2) the insolvency or bankruptcy of CytoDyn.

sustain as a result of the preliminary injunction."). Here Amarex is prepared with a sum certain of "the damages it may sustain as a result of the preliminary injunction." That amount is $15,927,920.

Finally, due to the amount at issue and CytoDyn's history of refusing to make payments, Amarex requests that the Court require CytoDyn to post the Rule 65(c) security in the form of a standby letter of credit, rather than a bond. *See Edward G. Bashian & Sons, Inc. v. Am. Nat. Bank & Trust Co.*, No. 96 C 6021, 1997 WL 337434, at *6 (N.D. Ill. June 16, 1997) (Noting that a bond is not the only type of security permitted under Rule 65(c), and that letters of credit will adequately protect the enjoined party.).

## CONCLUSION

CytoDyn's right to relief not "indisputably clear," nor does it meet the basic preliminary injunction elements. If the Court, however, determines otherwise and issues the requested mandatory preliminary injunction, it should require CytoDyn to post security in the form of a stand-by letter of credit for $15,927,920, the sum certain of damages Amarex may sustain as a result of the preliminary injunction.

Respectfully submitted,

/s/ Rachel T. McGuckian
Rachel T. McGuckian, #22452
MILES & STOCKBRIDGE P.C.
11 North Washington Street, Suite 700
Rockville, Maryland 20850
Phone: 301-762-1600
Email: rmcguckian@milesstockbridge.com

>Jon. R. Steiger
>Patrick M. McCarthy
>HOWARD & HOWARD ATTORNEYS PLLC
>450 W 4th Street
>Royal Oak, Michigan 48067
>Phone: 248-645-1483
>Email: pmm@h2law.com
>Email: js@h2law.com
>
>*Attorneys for Defendants*
>*Amarex Clinical Research LLC and NSF*
>*International*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of October, 2021, the foregoing was filed via the Court's CM/ECF system and served upon the following parties via the CM/ECF system:

>Mark D. Hopson (mhopson@sidley.com)
>Benjamin M. Mundel (bmundel@sidley.com)
>Lucas Croslow (lcroslow@sidley.com)
>Jacquelyn E. Fradette (jfradette@sidley.com)
>Sidley Austin, LLP
>1501 K Street, N.W.
>Washington, D.C. 20005
>
>*/s/ Rachel T. McGuckian*