# Exhibit 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

CYTODYN, INC,

    Plaintiff,

v.

AMAREX CLINICAL RESEARCH, LLC,
and NSF INTERNATIONAL,

    Defendants.

Civil Action No. 21-2533
Hon. Peter J. Messitte

## DECLARATION OF DANIEL F. HANLEY JR., M.D.

Pursuant to 28 U.S.C. § 1746, I, Daniel F. Hanley Jr., make the following statements based on personal knowledge, information and belief:

1. I am over eighteen years of age, have personal knowledge of the facts set forth herein, and am competent to testify to the same.

2. I am a professor of neurology, neurosurgery, and anesthesiology/critical care medicine at the Johns Hopkins University School of Medicine, and I have held these positions since 1996. I am also currently the Division Director, Brain Injury Outcomes at Johns Hopkins University School of Medicine and Director for Multicenter trials in the Johns Hopkins Institute for Translational Medicine.

3. I am a graduate of Williams College and Cornell University Medical College, and I have board certification in internal medicine and neurology & psychiatry

4. My 35-plus years in translational medicine have focused in the areas of clinical trial design, organization and interpretation of drug and device trials, development of strategic research plans, and FDA regulatory compliance.

5. For example, for more than a decade I was the principal investigator for the NIH-sponsored MISTIE III and CLEAR III trials investigating minimally invasive neurosurgical techniques to treat hemorrhagic stroke. As principal investigator for the National Center for Advancing Translational Sciences (NCATS) Johns Hopkins-Tufts Trial Innovation Center, I lead collaborative efforts to advance education and therapeutics via well-designed and innovative CTSA, faculty initiated, clinical trials.

6. For the last 20 years I have developed and led BIOS (Brain Injury Outcomes Division) an academic Clinical Research Organization which serves a significant portion of the Johns Hopkins ICTR and medical community. Its focus is to provide multicenter management to clinical trials evaluating therapeutic, preventive, and diagnostic interventions. We routinely serve up to 50 research sponsors from academia and industry at all stages of research program development and operational execution. In any given year I oversee the operations of from 5 to 10 multi-site clinical trials registered through clinicaltrials.gov.

7. I have published nearly 300 articles in peer-reviewed journals, received the Alexander Humboldt Research Prize for my accomplishments in brain injury research, and I have extensive clinical trials experience in the fields of stroke, hemorrhage, trauma, and brain infections.

8. I have been retained to address the various allegations of patient safety and electronic data capture ("EDC") as alleged by CytoDyn in this lawsuit, including those allegations in the Declarations of Dr. Nader Pourhassan and Dr. Christopher P. Recknor.

9. Based on my 35 plus years of experience with clinical trials, there are no issues of, or threats to patient safety, arising from the actions of Amarex as alleged by CytoDyn.

10. As in any disease based clinical trial, the patients in these studies at which CytoDyn's claims are directed, are under the care of their doctors while participating in these

clinical trials. The doctors are managing the patients and treating the patients' disorder, the doctors are overseeing or directly administering medicine(s) (including the experimental drug), the doctors are identifying and as needed, treating adverse effects, and the doctors are continuing to enter, monitor, and maintain the medical and other records. These records are usually the source documents for any clinical trial the patient is a participant in. The data collection by the experimental drug sponsor (in this case CytoDyn) or the sponsor's designee, such as a contract research organization ("CRO" - in this case Amarex) does not alter the doctor's treatment or care of the patient, or the doctor's obligations to observe and manage the patient.

11. There is a fundamental difference between the actual source medical records that the doctors use to treat their patients, on the one hand, and the trial database that a sponsor or CRO uses for submissions to the FDA, on the other hand. The doctors utilize the actual clinical records to treat their patients. These clinical records are the source of "truth" regarding patient status. These source documents represent the clinical data that the FDA requires for trial reporting and regulatory review of proposed new drug indications.

12. The trial data can be collected in many different processes including written, typed standard case report forms or more commonly now via electronic data entry into an electronic data capture system ("EDC"). This EDC is a complex data capture system used to achieve operational efficiency in a trial. It requires computer programming development, intensive monitoring, validation of correctness of data entry and digital maintenance on a secure digital platform. Thus, it is not for patient treatment, but rather is a web based digital tool that captures select data for use by a sponsor or CRO in an after-the-fact analysis of risk benefit to be presented to the FDA in the mandated regulatory pathway to new drug approval. This data subsequently undergoes statistical

analysis for submissions to the FDA.  The EDC is not a real time capturing of medical records for patient treatment.

13. Medical professionals caring for a trial participant have independent access to the clinical source records.  By virtue of participant consent both the sponsor and the CRO have access to all actual clinical source medical records, typically as set forth in written contracts between the participant treatment sites and the sponsor / CRO.

14. An EDC system is not necessary for receipt, monitoring or resolution of a serious adverse event ("SAE") occurring in a patient. These events must be documented in the clinical record or source document.  Thus, the absence of access to the EDC does not impact patient safety. In any clinical trial there may be adverse events that may or may not be associated with use of the experimental drug.  The relevant FDA regulations require a monitoring of SAEs, first with a notification system to the sponsor/CRO of a possible SAE and, second, a monitoring and investigatory process for assessing whether the adverse effect is related or not to the experimental drug, and if it is, then the reporting of the specific the SAE to the FDA.

15. For decades, the reporting of SAEs to the sponsor or CRO has been by phone, fax, email, and/or an EDC system, and each of those systems remains an option in clinical trials.  But, regardless of the means of notification, the monitoring and investigatory process does not rely on the EDC data but rather it involves review of the actual source medical records, and active communications (oral, written, and/or electronic) to and from the patient's doctor and the treatment sites. Therefore, in clinical trials there are always independent and redundant pathways for safety communication.  Finally, in the event it is determined that the FDA must be notified, the notification does not occur through or by the EDC system.

16. I understand that CytoDyn claims that there may be emergency situations in which it must be quickly known whether a patient in the clinical trial received the experimental drug or a placebo – this is known as unblinding. I agree such situations can arise, but only in those studies where some patients are receiving the drug and others a placebo. If all patients in the trial are receiving the actual experimental drug this is called an open label trial (administration of a known experimental drug). In that type of study there is no unblinding or emergency need to unblind a patient.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 26, 2021

*Daniel Hanley*
Daniel F. Hanley Jr. M.D.