# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CYTODYN, INC. | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) Civil Action No. 8:21-cv-2533 (PJM) |
| | ) |
| AMAREX CLINICAL RESEARCH, LLC, | ) |
| and NSF INTERNATIONAL, INC. | ) |
| | ) |
| *Defendants.* | ) |

## PLAINTIFF CYTODYN, INC.'S REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

Amarex's opposition confirms that CytoDyn is entitled to an injunction for access to CytoDyn's EDC databases and for an audit.

First, CytoDyn has shown it is likely to succeed on merits of its breach of contract claims. Amarex does not dispute that it has breached the MSA, but argues only that CytoDyn breached first. However, the MSA does not relieve Amarex of its obligation to turn over CytoDyn's data in the event of a payment dispute. The MSA expressly makes payment a condition precedent of *other* Amarex obligations, but not this one. This is fatal to Amarex's "first material breach" argument.

Similarly, on irreparable harm, CytoDyn outlined the four ways it will suffer irreparable harm, in addition to the harm to patients from Amarex's actions: (1) CytoDyn will lose investor goodwill; (2) will have its reputation damaged with doctors, patients, and the FDA; (3) will lose business opportunities; and (4) will suffer such a setback in its clinical program that the company's existence may be threatened. Amarex ignores these injuries entirely, arguing only that any harm to CytoDyn is "self-inflicted" as a result of CytoDyn's refusal to pay its outstanding invoices. But,

1

as Amarex well knows, CytoDyn does not believe those invoices are owed in their entirety, which is the subject of the parties' pending arbitration. This argument simply confirms that Amarex is holding CytoDyn's data hostage to extract payment on invoices that CytoDyn is disputing in good faith.

As to patient safety, Amarex argues only that the EDC has nothing to do with patient safety. But, Amarex has billed CytoDyn for "Set[ting] Up EDC Safety Module." Dkt. 6-5 (Exhibit B to motion for preliminary injunction), at 5. Amarex's own invoices and work orders demonstrate that the EDC is critical to safety. And FDA regulations confirm the patient-safety obligations of clinical trial sponsors and contract research organizations (CROs) such as Amarex. *See* 21 C.F.R. § 312.56 (sponsors and their designees responsible for oversight of clinical trials, including monitoring physicians' treatment of patients). Amarex has billed CytoDyn millions of dollars over the years for safety-related services. The argument that the EDC is unrelated to patient safety is completely belied by the evidence, including Amarex's own invoices.

Amarex argues that CytoDyn wants free services from Amarex, but this is incorrect: CytoDyn only wants Amarex to do what is necessary to allow a new CRO to take over CytoDyn's clinical trials. In particular it wants Amarex to turn over the data that CytoDyn owns.

Amarex completely ignores the language of the Master Services Agreement (MSA), which is necessary to resolving this dispute. Amarex does not and cannot dispute that CytoDyn "owns all right, title and interest, including all patents, copyrights, trademarks, and all other intellectual property or other proprietary rights, in and to all information, materials, documents and raw data . . . developed by Amarex as a result of performing the Services[.]" MSA § 5.2. There is no justification for Amarex refusing to surrender CytoDyn's property, particularly when the determination of what Amarex is owed will soon be adjudicated.

Amarex also suggests that the parties' entire dispute, including CytoDyn's right to the EDC databases, will be resolved in the arbitration, but this is not correct. The parties agreed in the MSA "that neither party will be prohibited from proceeding in a court to seek injunctive relief or other equitable remedies pending arbitration," precisely so that an injunction like this would be available. MSA § 15.4. The only way for CytoDyn to obtain the return of its paid-for property—the EDC databases—is through injunctive relief from this Court. That injunction would do no more than restore the status quo from before the parties' dispute arose, and is therefore within this Court's power to grant as a prohibitory injunction pending arbitration.[1]

CytoDyn is not asking for anything that it has not already paid for or is not willing to pay for, if the arbitrator determines additional money is owed. CytoDyn is even willing to give security, in the form of an injunction bond, for the amount Amarex previously demanded in order to surrender CytoDyn's property. There is simply no justification for Amarex to continue to withhold CytoDyn's clinical data. Accordingly, the Court should issue the preliminary injunction, order Amarex to restore CytoDyn's access to its clinical databases, turn over all CytoDyn property in Amarex's possession, and submit to an independent audit.

## LEGAL STANDARD

To begin, the entire premise of Amarex's argument is wrong. It asserts that CytoDyn must meet a higher standard because it is seeking a mandatory injunction. "[M]andatory injunctions

---

[1] Amarex argues in its motion to dismiss—but not in its response to CytoDyn's motion for preliminary injunction—that "CytoDyn's requests regarding Amarex's actions for violating the MSA, awarding costs and fees, and granting other relief that the Court deems proper are not requests for injunctive or equitable relief. Rather they are issues that should be dealt with before the arbitrator." Br. in Support of Motion to Dismiss (Dkt. 26-1), at 10. However, CytoDyn's breach of contract claims are the foundations for a grant of a preliminary injunction. And the MSA expressly provides that a prevailing party is entitled to "all reasonable costs and expenses of arbitration *or litigation*, including reasonable attorney fees at arbitration, *at trial*, and on any appeal or petition for review." MSA § 15.5.

alter the status quo, [while] prohibitory injunctions 'aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'" *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013)). "The status quo to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the 'last uncontested status between the parties which preceded the controversy.'" *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (quoting *Stemple v. Bd. of Ed. of Prince George's Cnty.*, 623 F.2d 893, 898 (4th Cir. 1980)). "'To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions,' but . . . '[s]uch an injunction restores, rather than disturbs, the status quo ante.'" *Id.* (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004)).

As Amarex summarized this lawsuit in its own words, "CytoDyn is asking the Court to order Amarex to *restore* data access[.]" Defendants' Response in Opposition to Motion for Preliminary Injunction 4 (Dkt. 27) ("Opp.") (emphasis added). In this, Amarex is correct: the relevant *status quo ante*—the "last uncontested status between the parties which preceded the controversy"—is for CytoDyn to have access to its clinical data. *See also* Opp. 4. ("EDC access will not be *restored*" (emphasis added)) (quoting Oct. 22, 2021 letter from Amarex to CytoDyn). CytoDyn's requested relief is therefore prohibitory, not mandatory, and the familiar standard for injunctive relief applies. *See HIAS, Inc. v. Trump*, 415 F. Supp. 3d 669, 679 (D. Md. 2020) (Messitte, J.).

Even if the higher standard for a mandatory injunction applied, however, CytoDyn's entitlement to relief is "indisputably clear," and the injunction should still issue.

# ARGUMENT

## I. CYTODYN IS ENTITLED TO INJUNCTIVE RELIEF.

CytoDyn is likely to succeed on the merits of its breach of contract claim, and is clearly suffering irreparable harm—as are the patients enrolled in CytoDyn's trials, whose safety Amarex continues to discount. The equities and the public interest also strongly favor injunctive relief. The Court should therefore issue the preliminary injunction.

### A. CytoDyn Will Succeed on its Claim that Amarex Breached, and Continues To Breach, the MSA.

Amarex correctly asserts that "this is a straightforward breach of contract case." Opp. 6. Yet, Amarex's opposition attempts to ignore the plain text of the contract. Indeed, it quotes the contract's language only twice, for a grand total of 27 words. *See* Opp. 2, 9. Amarex simply does not respond to CytoDyn's showing that under the MSA it owns the data and is entitled to its return. *See* Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction (Dkt. 6-1) 8, 10-13, 14-16, 19, 21 ("Plf's PI Br.").

MSA Section 5.2 states that "CytoDyn owns all right, title and interest . . . in and to all information, materials, documents and raw data . . . developed by Amarex as a result of performing the Services, including without limitation any Deliverables[,] and . . . CytoDyn's Confidential Information (all such information and materials, 'Client Materials')." *See* Plf's PI Br. 11. Thus under the contract CytoDyn owns the data. MSA Section 4.1 obligates Amarex "to return or destroy any Confidential Information to [CytoDyn] at the request and cost of [CytoDyn]," including "all information, materials, documents and raw data . . . developed by Amarex as a result of performing the Services." *See* Plf's PI Br. 12. Thus, Amarex must return the data, which is defined as Confidential Information, to CytoDyn.

MSA Section 3.4 authorizes Amarex to withhold "the results of data analysis for any Data Safety Monitoring Board Meetings, Interim Analyses, and/or Final Analyses" in the event of nonpayment—but does *not* authorize Amarex to withhold anything else, including the EDC databases and the clinical data they contain. Plf's PI Br. 15-16. And MSA Section 2.4 states that "CytoDyn shall be entitled, with at least 24 hours' prior notice, to audit and inspect records, facilities used, and the conduct of the Services relating to a Project Work Order under this Agreement." *See* Plf's PI Br. 13.

This text of the parties' contract is clear and it should control. *See Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007) ("If the language of the contract is unambiguous, we give effect to its plain meaning . . . ."). Because of Amarex's failure to offer any alternative reading of these crucial clauses of the MSA, CytoDyn's explanations of the contractual language are undisputed. And that undisputed contractual language resolves this case.

Amarex only has two responses, but neither is persuasive. First, Amarex claims that the data is its "work product," Opp. 7. But, the MSA makes it perfectly clear that the data is CytoDyn's property, even if it is "developed by Amarex as a result of performing the Services." *See* Plf's PI Br. 14. The MSA makes no provision for "work product" and the concept is irrelevant here. Further, the data in the EDCs is almost exclusively the work product of the *trial sites*, not of Amarex. As Amarex concedes, the EDC is "a compilation of extracted summary data from a clinical study," Opp. 7, the result of "medical records created by doctors."

Second, Amarex claims that it is entitled to withhold the data and "suspend performance of all services" because CytoDyn has unpaid invoices, Opp. 6. But this is a misrepresentation of the contract, which only permits Amarex to withhold "the results of data analysis" in the event of nonpayment. Plf's PI Br. 15-16. The contract does not permit Amarex to withhold the data that

the parties agreed that CytoDyn owns. There is no reason the contract would include this specific language except to address this precise situation: a dispute over payments that raises the question of what Amarex must turn over and what it is permitted to withhold. *Id.* The MSA answers that question, and Amarex does not even attempt to argue otherwise.

Amarex also offers no explanation at all for its refusal to consent to an audit at CytoDyn's expense, which the MSA clearly requires. *See* Plf's PI Br. 16-17. CytoDyn's audit rights, like its data access rights, are not subject to payment of outstanding invoices. And even if it were, Amarex has offered no explanation for why CytoDyn should be prevented from exercising its audit rights with respect to the $80 million of work—or 86 percent of Amarex's invoices—that CytoDyn already has paid.

Unable to defend itself using the language of the contract, Amarex falls back on arguing, in effect, that "CytoDyn started it." But the "first material breach" doctrine does not apply here because "[t]his doctrine only excuses a non-breaching party's performance when such obligations were dependent upon the promises that the breaching party failed to perform." *Monster Daddy, LLC v. Monster Cable Prod., Inc.*, 483 F. App'x 831, 835 (4th Cir. 2012) (citing Restatement (Second) of Contracts § 237 cmt. e (1981)). In *Monster Cable*, the defendant argued that a forum selection clause in the parties' agreement was not enforceable because the plaintiff had breached the agreement before bringing suit. The Fourth Circuit rejected that argument, noting that "a party's breach of one promise does not discharge the non-breaching party's duties with respect to unrelated or independent promises to perform under the parties' contract." *Id.* Because "performance under the forum selection clause was not dependent upon the performance of any other contract provision contained in the settlement agreement," then adopting the defendant's

7

"first material breach" argument "would result in rendering an independent and unambiguous provision in the parties' contract meaningless." *Id.*

Here, the MSA *does* expressly condition *some* of Amarex's duties on CytoDyn's payment of invoices: Amarex may suspend turning over "the results of data analysis" if CytoDyn fails to pay. MSA § 3.4. But under the MSA, the duty to return CytoDyn's data is not excused by nonpayment. There is no ambiguity here, any more than in *Monster Cable*. To adopt Amarex's reading would therefore "render[] an independent and unambiguous provision in the parties' contract meaningless." *Id.* Amarex cannot ask this Court to rewrite the parties' contract because it is now unhappy with the bargain it struck.

As CytoDyn showed in its opening brief, it was likely to succeed on the merits of its breach-of-contract claims. Now Amarex's failure to respond to the plain text of the MSA has made that clear. This factor therefore strongly supports granting CytoDyn's motion.

**B.    CytoDyn Has Shown That It Is Suffering Irreparable Harm.**

Amarex also fails to show that CytoDyn will not suffer irreparable harm if it is not granted an injunction. Amarex's primary argument in in its opposition brief is that clinical trial sponsors, such as CytoDyn, and CROs, such as Amarex, have nothing to do with patient safety. While this is simply incorrect, it is not essential to deciding this motion because CytoDyn put forward evidence of other forms of irreparable harm, and Amarex failed to respond to any of them.

First, Amarex claims that "the "irreparable harm" provision of the MSA is "expressly limited to Section 4, and Section 4 deals with confidentiality only." Opp. 9. But again, Amarex has failed to actually engage with the language of the contract. Section 4 does not "deal[] with confidentiality only," as CytoDyn explained in its opening brief. *See* Plf's PI Br. 11-12, 19. Rather, the Section deals with the parties' obligations regarding "confidential information," including "all Client Materials (as defined in Section 5.2)," which Amarex must "return or destroy . . . at the

8

request and cost of" CytoDyn. MSA § 4.1. Section 5.2 defines "Client Materials" to include "all information, materials, documents and raw data . . . developed by Amarex as a result of performing the Services, including without limitation any Deliverables." MSA § 5.2. Amarex has breached Section 4 of the MSA by failing to "return" CytoDyn's "Client Materials"—the EDC databases. In the MSA, Amarex "expressly acknowledge[d] and agree[d]" that such a breach could cause "immediate and irreparable harm" to CytoDyn, and that CytoDyn would be entitled to "equitable and injunctive relief, without bond, in connection with such a breach[.]" MSA § 4.4. CytoDyn is therefore clearly entitled to injunctive relief for Amarex's failure to turn over the EDC databases and CytoDyn's other "Client Materials."

Second, CytoDyn showed—and Amarex does not dispute—that Amarex's actions will cause it to lose investor goodwill, to suffer damage to its reputation with doctors, patients, and the FDA, to lose business opportunities, and to suffer setbacks in its clinical program so significant that they will threaten the company's existence. *See* Plf's PI Br. 19-20. Amarex does not dispute *any* of these points, instead arguing simply that these injuries are "self-inflicted," because CytoDyn could simply "pay[] what is owed" and get its data back. Opp. 9. But the extent to which these amounts are *actually* owed is the subject of the pending arbitration. The only claim at issue here is simply who owns the clinical data and whether Amarex is entitled to withhold it.

CytoDyn also has shown that patient safety is a basis for finding irreparable harm. CytoDyn "transfer[red] responsibility for . . . the obligations set forth in [FDA regulations] to a contract research organization," Amarex. Accordingly Amarex was and is "subject to the same regulatory action as a sponsor for failure to comply with any obligation assumed under these regulations." 21 C.F.R. § 312.52. FDA regulations therefore required Amarex, as CytoDyn's CRO, to "monitor the progress of all clinical investigations" and take action if "an investigator is

9

not complying with the signed agreement (Form FDA-1572), the general investigational plan, or the requirements of this part or other applicable parts." *Id.* § 312.56(a), (b). If any investigator was out of compliance, as determined through Amarex's oversight, Amarex had an obligation to "discontinue shipments of the investigational new drug to the investigator and end the investigator's participation in the investigation." *Id.* § 312.56(b). Amarex was also required to "review and evaluate the evidence relating to the safety and effectiveness of the drug as it is obtained from the investigator," and "make such reports to FDA regarding information relevant to the safety of the drug as are required under" FDA regulations. *Id.* § 312.56(c). It is a truism, as Amarex's expert observes, that "[a]n investigator is responsible for . . . protecting the rights, safety, and welfare of subjects under the investigator's care." *Id.* § 312.60. Amarex also had responsibility to monitor and enforce the obligations of the investigators in protecting patient safety. By terminating its performance of these obligations, without any plan in place to transition its responsibilities to a new CRO or even any willingness to cooperate with a plan developed by CytoDyn, Amarex is putting patient safety at risk. *See* Plf's PI Br. 10-11.

There is also another reason why "[a]n investigator must immediately *report to the sponsor* any serious adverse event," *id.* § 312.64(b). Only the sponsor (or in this case, its CRO designee) can aggregate and analyze data from multiple trial sites in order to identify trends and anomalies that may not be apparent to any one investigator. A single patient developing pneumonia after receiving the trial drug might be a coincidence, and even if one patient at each site developed the condition, no one investigator would have any reason to think the pneumonia was related to the trial drug. But the CRO, with access to the data from each trial site, would be able to see a trend emerging, and could take appropriate steps to investigate the possible connection between the drug and this recurring adverse event. The EDC—which Amarex refuses to make available to CytoDyn,

10

even though CytoDyn owns it—is the tool that a CRO uses to review data from each trial site in a study.

The Court need not get into these FDA regulations, however, because Amarex's own documents put the lie to its attempt to wash its hands of CytoDyn's patient safety concerns. In its brief, Amarex states that "no patient safety issues exist," Opp. 1, because **"*[t]he EDC has nothing to do with patient safety*,"** Opp. 7 (emphasis added). But in its bills and work orders to Amarex it said the exact opposite and trumpeted its work on patent safety. Specifically, Project Work Order 37, which the parties executed on November 20, 2019, includes an entire category of services labeled "SAFETY." Dkt. 6-5 (Exhibit B to motion for preliminary injunction), at 5. The work order specified that Amarex would carry out functions including "**Set Up EDC Safety Module**," "Prepare Safety Management Plan," and "Medical Monitoring (24/7)." *Id.* (emphasis added). Either the EDC has something to do with "safety" or Amarex is billing for services it didn't perform. As explained in the November 5, 2021 declaration of Dr. Chris Recknor, the EDC is in fact the *primary* means that CytoDyn and Amarex use to monitor adverse events, and is a key tool for daily monitoring to ensure that CytoDyn's studies are being conducted safely at the trial sites. Nov. 5, 2021 Declaration of Dr. Christopher P. Recknor, M.D. ("Nov. 5 Recknor Decl.") ¶ 7.

Amarex also claims it is "remarkable" that CytoDyn is concerned about the possible need to unblind patients, Opp. 9, because CytoDyn's current studies are all unblind. But Amarex ignores that a patient in a previously blinded study could have an adverse event that potentially could be related to the patient's participation in the clinical trial. This is so because it could take months for a patient to develop an adverse event that might be related to the trial drug. Nov. 5 Recknor Decl. ¶ 17. CytoDyn's concern therefore is not just about currently enrolled patients. Patients

11

who were previously blinded in earlier CytoDyn studies may need to be unblinded at any time to determine whether an adverse event is related to leronlimab. Nov. 5 Recknor Decl. ¶¶ 17-18.

Amarex's purported expert, Dr. Hanley, does not have (or claim to have) any information about CytoDyn's actual clinical trials or how information flows between CytoDyn, Amarex, and the clinical trial sites. Instead, he can opine only on how clinical trials are "usually," "commonly," or "typically" operated, Hanley Decl. (Dkt. 27-2), at ¶¶ 10, 12, 13. Dr. Hanley opines that "[a]n EDC system is not necessary for receipt, monitoring or resolution of a serious adverse event ('SAE') occurring in a patient." But, he does not discuss—because he does not know—how SAE monitoring has actually been handled in CytoDyn's trials in the past, how *AE* monitoring is handled, or how either is being handled now that Amarex has cut off EDC access to CytoDyn and the trial sites. Dr. Hanley notes that "phone, fax, [and] email" are "an option" for SAE reporting, *id.* ¶ 15, but does not comment on the confusion that would be created if, after months or years of submitting SAE reports via the EDC, that "option" suddenly becomes unavailable. The truth is that "[t]he EDC is an essential tool for ensuring that a trial is being properly administered to protect patient safety," Nov. 5 Recknor Decl. ¶ 8, and although "[t]here are other means of communicating with trial sites, such as by fax or email, and the records in the EDC might be largely replicated in paper records at the trial sites," "the EDC is the primary tool that CytoDyn and Amarex have used to maintain trial records and monitor patient safety in all of CytoDyn's studies." *Id.* ¶ 9.

### C. The Balance of Equities and Public Interest Plainly Favor CytoDyn.

Amarex devotes a mere paragraph to the balance of equities and the public interest, Opp. 10, perhaps because these remaining factors are also strongly in CytoDyn's favor. *See* Plf's PI Br. 20-24. As to the burden on Amarex, there is none. *Signature Flight Support Corp. v. Landow Aviation Ltd.*, 698 F. Supp. 2d 602, 624 (E.D. Va. 2010) ("Granting the injunction will not harm Defendant because it merely forces [the defendant] to abide by its own contractual obligations.").

Restoring CytoDyn's access to the EDC databases is a matter of changing a few settings on a web-based application, which could probably be completed in a matter of minutes. To the extent Amarex incurs any hosting fees or other marginal costs attributable to restoring CytoDyn's access, CytoDyn has repeatedly stated that it is willing to pay for those costs. Likewise, CytoDyn is prepared to pay for the independent audit of Amarex to which CytoDyn is entitled. Any burden on Amarex of cooperating with the audit will be fully compensated by CytoDyn—and is, in any event, merely a matter of Amarex "abid[ing] by its own contractual obligations," *id.*

And while Amarex would prefer to ignore the interests of the patients enrolled in CytoDyn's trials, the fact remains that Amarex's actions "potentially compromise ongoing research and treatments," which harms the public interest. *Roderer v. Treister*, 2 F. Supp. 3d 1153, 1163 (D. Or. 2014).

## II. CYTODYN IS WILLING TO PROVIDE AN APPROPRIATE BOND.

Upon the issuing of an injunction, CytoDyn is prepared to post a proper surety bond as required by Rule 65. When a court issues an injunction to preserve the status quo pending arbitration, the bond should be "conditioned . . . upon the possible wrongful issuance of the preliminary injunction, and not upon the outcome of the merits of the arbitration." *Lever Bros. Co. v. Int'l Chem. Workers Union, Loc. 217*, 554 F.2d 115, 120 (4th Cir. 1976) ("it is settled that the recoverable damages under such a bond are those that arise from the operation of the injunction itself and not from damages occasioned by the suit independently of the injunction."); *see also* 11A Fed. Prac. & Proc. Civ. § 2954 (3d ed.) ("The security will not include any damages, however, for claims against the party who instituted the action other than those directly attributable to the improvidently issued injunction" and "the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant.").

Amarex concedes that the proper amount of security for an injunction is measured by "the amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period he is prohibited for engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained." *Hoechst Diafoil Co. v. Nan Yan Plastics Corp.*, 147 F.3d 411, 421 (4th Cir. 1999) (quoting 11A Charles Alan Wright, *et al.*, *Federal Practice & Procedure* § 3954, at 292 (2d ed. 1995)); *see also CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 893 F. Supp. 508, 525 (D. Md. 1995) (Messitte, J.) ("damages claimed under an injunction bond must arise from the operation of the injunction itself, not from damages occasioned by the suit independently of the injunction.").

This means that the sole purpose of an injunction bond is to make the defendant whole for "such costs and damages as may have been incurred or suffered by the Company should it later have been determined by the District Court, the Court of Appeals, or the Supreme Court of the United States that the Company had been wrongfully enjoined or restrained." *Lever Bros.*, 554 F.2d at 120. Under this rule, the proper security amount would be zero. CytoDyn asks for two things: access to its data, and access for an audit, and CytoDyn is willing to pay upfront for any administrative costs that Amarex incurs in complying with those requests. Thus if a court later determines that the injunction was improperly granted, Amarex will have suffered no harm. That is what the parties agreed to in the MSA, which provides that CytoDyn is entitled to injunctive relief "without bond" in circumstances in which Amarex breaches Section 4 by failing to turn over CytoDyn's Client Data on demand. MSA Section 4.4.

Alternatively, CytoDyn could put up a bond in the amount of the cost of Amarex providing the EDC, pending a permanent injunction. That cost is quite low, and no more than $1 million over

a period of six months. Moreover, CytoDyn has already paid for the vast majority of costs associated with developing and maintaining the EDC. As stated in the declaration of Mary Ann Ivy, CytoDyn has paid $2.79 million for EDC services over the life of the Amarex MSA, and the disputed invoices include, at most, $335,851 for EDC-related items. Nov. 5, 2021 Declaration of Mary Ann Ivy ¶¶ 3-5. Because CytoDyn has already paid for the EDC databases, a nominal bond would be appropriate here.

To artificially inflate the amount of bond, Amarex argues that it should be entitled to a bond for the full amount of the invoices in dispute between the parties. That position is foreclosed by binding precedent, as discussed above. *Lever Bros.*, 554 F.2d at 120 (bond for an injunction pending arbitration is properly "conditioned . . . upon the possible wrongful issuance of the preliminary injunction, and not upon the outcome of the merits of the arbitration.").

However, as a demonstration of good faith, CytoDyn proposes to post a bond of $6.5 million as security for the injunction, which is the amount of Amarex's last pre-litigation demand, communicated through Martin Lush of NSF. $6.5 million is likely an order of magnitude more than any administrative expenses Amarex may incur to comply with the Court's injunction.

Finally, if the Court imposes security, it should be in the form of a bond, not a standby letter of credit. Amarex cites a 25-year-old out-of-circuit case in support of its request that the Court require CytoDyn to post a standby letter of credit, rather than a bond, as security. But that case has no application here: it involved a defendant that *already* had letters of credit from the plaintiff that the court determined were sufficient security for the injunction, and therefore *no bond or other additional security was necessary*. See *Edward G. Bashian & Sons, Inc. v. Am. Nat. Bank & Tr. Co.*, No. 96 C 6021, 1997 WL 337434, at *6 (N.D. Ill. June 16, 1997) ("The state court judge further directed that the letters of credit stand as the injunction bond. . . . The letters of credits

15

adequately protect ANB and a separate injunction bond will not be required."). Amarex has identified no case in which a Court required a party to obtain and provide a new letter of credit, rather than a bond, as security for an injunction.

Amarex has also not offered any real explanation of why a standby letter of credit, which generally is considerably more expensive than a bond, is necessary, or why a bond is inadequate security. Moreover, the Court should retain its equitable discretion to "refuse to award damages on a restraining order or injunction bond," *Lasercomb Am., Inc. v. Holliday*, 961 F.2d 211 (4th Cir. 1992), because, as noted, a wrongfully issued injunction will cause no monetary harm to Amarex. *See id.* ("Courts have continued to retain the power to weigh the equities of the particular case in awarding or denying damages resulting from a preliminary injunction wrongfully obtained."); *CVI/Beta Ventures*, 893 F. Supp. at 525 (Messitte, J.) ("In the Fourth Circuit, damages will not be awarded on an injunction bond unless it can be shown that the plaintiff prosecuted the suit maliciously and without probable cause."). A standby letter of credit would deny the Court this important role in determining whether and when a bond should be paid.

## CONCLUSION

For the foregoing reasons, CytoDyn's motion for a preliminary injunction should be granted. Thus, this Court should order Amarex to return CytoDyn's proprietary data immediately by granting full access to the EDC and clinical data for each study and participating in the contractually required audit.

DATED: November 5, 2021

Respectfully submitted,
/s/ Lucas W.E. Croslow
Mark D. Hopson*
Benjamin M. Mundel†
Jacquelyn E. Fradette
Lucas W.E. Croslow†
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005

16

                                                  Telephone: (202) 736-8000

                                                  *Counsel for Plaintiff CytoDyn, Inc.*

                                                  * Application for admission pending
                                                  † Admitted *pro hac vice*

272554068