# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CYTODYN, INC. | ) |
| | ) |
|     *Plaintiff*, | ) |
| | ) |
|     v. | )  Civil Action No. 8:21-cv-2533 (PJM) |
| | ) |
| AMAREX CLINICAL RESEARCH, LLC, | ) |
| and NSF INTERNATIONAL, INC. | ) |
| | ) |
|     *Defendants.* | ) |

## PLAINTIFF CYTODYN, INC.'S RESPONSE
## TO DEFENDANTS' MOTION TO DISMISS

    Plaintiff CytoDyn, Inc. ("CytoDyn") brought this lawsuit to recover its clinical trial data, which is being held hostage by CytoDyn's contract research organization, Amarex Clinical Research LLC ("Amarex") and Amarex's corporate parent, NSF International, Inc. ("NSF" or "NSF International" and, together with Amarex, the "Defendants"). Even though the parties are now engaged in arbitration regarding their payment dispute, as required by the Master Services Agreement ("MSA") (Compl. Ex. A., Dkt. 1-2) between CytoDyn and Amarex, Amarex and NSF nevertheless refuse to turn over the clinical trial data that is indisputably CytoDyn's property and that has no value to Amarex and NSF other than as a bargaining chip. Defendants' Motion to Dismiss and Brief in Support (Dkt. 32-1) ("Motion to Dismiss" or "Mot.") rehash the arguments in their Opposition to CytoDyn's Motion for Preliminary Injunction (Dkt. 27), but Defendants still do not—and cannot—dispute that CytoDyn owns the data and that the MSA requires its return.

    Amarex and NSF argue that the arbitration clause of the MSA somehow bars certain of CytoDyn's claims, but that is incorrect, as even a cursory reading of the MSA proves: the clause

1

expressly provides that "neither party will be prohibited from proceeding in a court to seek injunctive relief or other equitable remedies pending arbitration." MSA §§ 15.4, 15.5; *see infra* Part I. Amarex and NSF argue that the Court lacks personal jurisdiction over NSF, based on a threadbare declaration from an NSF officer—who, as it turns out, is also an officer of Amarex, further demonstrating that NSF and Amarex are closely intertwined. In any event, CytoDyn has made a *prima facie* showing that the Court has personal jurisdiction over NSF, and if more is needed—on account of the contradictions between NSF's litigation arguments and its public representations about owning and controlling Amarex—then the Court should order limited jurisdictional discovery to determine the true nature of the relationship between NSF and Amarex. *See infra* Part II. Finally, NSF and Amarex argue that the Amended Complaint does not state a claim against NSF, because only Amarex is a counterparty to the MSA and CytoDyn's tort claims are not directed to NSF. But this, too, is incorrect: CytoDyn's tort claims in the Amended Complaint are alleged against both NSF and Amarex,[1] and the Complaint contains numerous allegations about NSF's direct and actionable involvement in the wrongful withholding of CytoDyn's data. *See infra* Part III.

The Motion to Dismiss should be denied, or, in the alternative, the Court should order jurisdictional discovery into the corporate relationship between NSF and Amarex.

## BACKGROUND

CytoDyn is a biotech company focused on the clinical development of leronlimab, an investigational drug being studied as a treatment for HIV, cancer, COVID-19, and other serious diseases.[2] Am. Compl. ¶ 21. To seek FDA approval for leronlimab, CytoDyn has sponsored 22 clinical

---

[1] As to Amarex, CytoDyn's tort claims are pleaded in the alternative to relief under the MSA, which is undisputedly a valid and binding contract between CytoDyn and Amarex.
[2] The full background of this dispute is set forth in CytoDyn's Amended Complaint and in its briefing on the Motion for Preliminary Injunction. Only the facts most relevant to Defendants' Motion to Dismiss are summarized here.

trials in which the drug has been or is being tested for safety and efficacy, including four main trials in which patients are currently receiving leronlimab: three studies of HIV, and one study of non-alcoholic steatohepatitis (NASH). *Id.*

CytoDyn engaged Amarex to manage the clinical trials of leronlimab, as its contract research organization (CRO). *Id.* ¶ 22. Since 2014, Amarex and CytoDyn have each signed over 70 project work orders obligating Amarex to conduct clinical trial management on CytoDyn studies. *Id.* ¶ 28. CytoDyn has paid more than $80 million pursuant to the MSA and those work orders. *Id.* One of Amarex's principal duties for each clinical trial was to maintain CytoDyn's data. *Id.* ¶ 33. The dynamic data used and collected in a clinical trial is maintained, by a process of collection and ongoing quality control, in a dynamic database known as the "electronic data capture" or the "EDC." *Id.* ¶ 33–34. Pursuant to work orders under the MSA, Amarex programmed and maintained, at CytoDyn's expense, the EDC for each study. *Id.* ¶ 35.

In 2019, NSF International acquired a majority interest in Amarex. *Id.* ¶ 5. In NSF's public announcement about the merger, both NSF's and Amarex's CEOs touted the benefits of the acquisition, noting how it would benefit both "NSF International" and Amarex. *Id.* ¶¶ 5-6. Amarex's logo now describes Amarex as "an NSF International Company." *Id.* ¶ 7.

Amarex's integration into the NSF family coincided with a deterioration of the relationship between CytoDyn and Amarex, as CytoDyn learned that Amarex has failed to perform certain of its responsibilities under the MSA, work orders, and monitoring plan. *Id.* ¶ 39. Amarex also covered up its failures by making false statements to CytoDyn about the work it performed and by failing to provide CytoDyn with information to which it is entitled. *Id.* ¶ 42. Despite these failings, Amarex has continued to submit invoices for work that CytoDyn does not believe Amarex actually performed, and for work that it did not perform in compliance with the MSA, work orders, and

relevant standards. *Id.* ¶ 53. CytoDyn has therefore refused to pay Amarex for a number of outstanding invoices. *Id.* Nonetheless, Amarex continues to demand payment under the invoices and has refused to do any more work, until CytoDyn pays the outstanding invoices. *Id.* ¶ 14.[3]

CytoDyn has repeatedly attempted to amicably resolve the agreement without litigation. In June 2021, CytoDyn's Chief Operating Officer attempted to discuss Amarex's perceived failings with his counterpart at NSF International, Tom Chesnut. *Id.* ¶ 46. Mr. Chestnut then referred CytoDyn's COO to Martin Lush, an NSF employee, who wrote in an email that he had engaged with detailed discussions with NSF International's CEO about the issues and asked CytoDyn not to discuss the issues with anyone at Amarex. *Id.* ¶¶ 46-47. From that point forward, CytoDyn's attempts to resolve its dispute with Amarex were addressed almost exclusively by Mr. Lush. As one example, when CytoDyn sought to exercise its right under the MSA to audit Amarex, it was Mr. Lush who responded on Amarex's behalf and refused to consent to any audit. *Id.* ¶¶ 49-50. In these and other instances, it was consistently Mr. Lush who purported to speak for Amarex. *Id.* ¶ 51.

In its Amended Complaint, CytoDyn seeks access to the EDC database, which it needs to monitor the safety of the clinical studies and to track adverse events and ensure proper adverse event reporting to the FDA. *Id.* ¶¶ 31-32. The MSA explains that all study data is the property of CytoDyn, which owns "all right, title and interest" to clinical data collected from its trials, including the EDC, which is purpose-built for each trial. MSA § 5.2. Amarex has no ownership right to data collected from CytoDyn's clinical studies, and upon CytoDyn's request, the MSA requires that Amarex return the data from any clinical study immediately. MSA § 4.1. Despite CytoDyn's numerous requests, however, Amarex and NSF have refused to turn over any of CytoDyn's data.

---

[3] Pursuant to the MSA's arbitration provision, CytoDyn has filed a demand for arbitration with the American Arbitration Association to resolve its payment related claims. As discussed herein, the MSA expressly exempts the equitable relief requested by CytoDyn from mandatory arbitration.

Am. Compl. ¶ 81. The Amended Complaint also seeks specific performance of Amarex's obligations under the MSA's audit clause, since Amarex and NSF continue to refuse to allow an independent auditor to verify Amarex's performance under the MSA. Am. Compl. ¶¶ 97-106; MSA § 2.4.

## ARGUMENT

Defendants argue for dismissal of CytoDyn's claims on three grounds: that the arbitration clause in the MSA bars some of CytoDyn's claims, that the Court lacks jurisdiction over NSF International, Inc. ("NSF"), and that the Amended Complaint does not state a claim against NSF. Each of these arguments is wrong, and the Motion must be denied. In the alternative, the Court should order jurisdictional discovery so that CytoDyn can discover additional jurisdictional facts necessary to confirm that this Court has jurisdiction over NSF.

**I.    The Master Services Agreement Expressly Permits a Suit for "Injunctive Relief or Other Equitable Remedies," Including the Fees and Costs of Litigation.**

There is no basis in the MSA to dismiss any of CytoDyn's claims, including its request for the fees and costs of this litigation. *Contra* Mot. 9–10 (arguing that CytoDyn's "request[s] to determine that Amarex's acts violated the MSA, award attorney's fees, costs, and other expenses, and grant other relief as the Court deems proper" are barred by the MSA). Section 15.4 of the MSA provides "that neither party will be prohibited from proceeding in a court to seek injunctive relief or other equitable remedies pending arbitration." MSA § 15.4. Further, Section 15.5 states that "the prevailing party will be entitled to recover all reasonable costs and expenses of arbitration *or litigation*, including reasonable attorney fees[.]" *Id.* § 15.5 (emphasis added). Defendants fail even to acknowledge this language, much less make any argument about it. "[I]njunctive relief," "other equitable remedies pending arbitration," and "reasonable costs and expenses of . . . litigation, including reasonable attorneys fees" are precisely what CytoDyn seeks in this case, and

Defendants have offered no explanation for their view that the MSA bars these claims. It is undisputed that the parties' respective *damages* claims will be resolved through arbitration, but this Court is the proper venue for CytoDyn's equitable claims *pending arbitration*.

## II.     The Amended Complaint Pleads a *Prima Facie* Case of Personal Jurisdiction over NSF International.

NSF is subject to personal jurisdiction in this forum because it exercises "significant control" over Amarex, its in-state subsidiary. *Contra* Mot. 3-8. Especially once the Court "draw[s] all reasonable inferences arising from the proof, and resolve[s] all factual disputes, in [CytoDyn's] favor," *Du Daobin v. Cisco Sys., Inc.*, 2 F. Supp. 3d 717, 722 (D. Md. 2014) (quoting *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993)), it is clear that CytoDyn's Amended Complaint makes the "prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Artis v. Receivables Performance Mgmt., LLC*, No. CV PJM 18-2575, 2020 WL 978810, at *2 (D. Md. Feb. 27, 2020) (quoting *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009)).

The Maryland long-arm statute permits the exercise of jurisdiction over "a person, who directly or *by an agent* . . . transacts any business or performs any character of work or service in the State." Md. Cts & Jud. P. § 6-103(b) (emphasis added). When, as here, personal jurisdiction is based on a parent's relationship with its subsidiary, Maryland courts employ an agency test to determine whether the two entities should be treated as one for jurisdictional purposes. *Mylan Labs., Inc.*, 2 F.3d at 61. The Court must determine "whether significant decisions of the subsidiary must be approved by the parent," *id.*, as well as whether the defendants maintain corporate formalities and whether the parent "knew, or should have known, that its conduct would have some impact in Maryland," *id.* at 61–62. *See also Finance Co. of Am. v. BankAmerica Corp.*, 493 F. Supp. 895, 903 (D. Md. 1980). The Amended Complaint alleges that NSF exercises substantial control

6

over Amarex such that it is subject to this Court's jurisdiction. *Id.* ¶ 17. Indeed, the Complaint alleges that in the two years since NSF acquired Amarex, NSF has made nearly all of Amarex's substantial business decisions, particularly those concerning Amarex's relationship with CytoDyn. *Id.* ¶ 18. For example, when CytoDyn attempted to investigate irregularities under the MSA, Tom Chestnut, NSF's COO, initially spoke on Amarex's behalf. *Id.* ¶ 46. As discussions continued, Mr. Chestnut introduced CytoDyn's COO not to an Amarex officer or employee, but rather to Martin Lush, an NSF Vice President. *Id.* ¶ 47. Mr. Lush even asked CytoDyn's COO not to disclose their conversation to anyone at Amarex. *Id.* ¶ 47. Shortly thereafter, when CytoDyn sought—via an email sent only to Amarex personnel—to exercise its contractual right to an audit, it was again Mr. Lush who responded to speak for Amarex and reject the request. *Id.* ¶ 50. And, as the Amended Complaint also alleges, Amarex has consistently refused to return CytoDyn's data at NSF's direction. *Id.* ¶ 43. These allegations, which must be accepted as true at this stage, show that NSF acts as the day-to-day decisionmaker for Amarex, and exercises such extensive control over Amarex that, for purposes of this dispute, the entities are indistinguishable.

Defendants assert that CytoDyn "falsely claims that 'NSF International owns and control Amarex." Mot. 7. Defendants' support for that strong claim is a cursory declaration from Julie Timmer, who—as the Amended Complaint explains—is a corporate officer of both NSF International and Amarex. Am. Compl. ¶¶ 9-10. But neither the Timmer Declaration nor Defendants' Motion to Dismiss addresses the specific allegations in the Amended Complaint regarding the relationship between NSF International and Amarex:

- NSF's President and CEO has publicly stated that "Amarex brings clinical trial expertise to NSF International's large base of training, quality and consulting clients, and Amarex's CRO clients may now benefit from NSF International's global reach[.]" *Id.* ¶ 5.

7

- Amarex's founder has publicly stated that "Amarex is excited to join the NSF International family," and that, thanks to the transaction, "Amarex will be able to leverage NSF International's global infrastructure." *Id.* ¶ 6.

- Amarex publicly holds itself out as "an NSF International company." *Id.* ¶ 6.

- NSF International describes Amarex's Germantown office as a North American "location" of NSF International. *Id.* ¶ 8.

- Ms. Timmer, Defendants' declarant in support of the Motion, is a signatory on behalf of Amarex to publicly available corporate documents, and in November 2019 was Amarex's corporate secretary, in addition to her role as NSF International's Vice President and Chief Legal Officer. *Id.* ¶¶ 9-12.

- Michael Walsh is also a signatory on behalf of Amarex to publicly available corporate documents, and in November 2019 was Amarex's Vice President, in addition to his role as NSF International's Vice President and Chief Financial Officer. *Id.* ¶¶ 9-11.

Defendants do not address the Amended Complaint's allegations regarding these numerous public representations of a corporate relationship between NSF International and Amarex, but instead appears to rely on corporate sleight-of-hand, asserting that NSF International "is not the entity that owns Amarex." However, Defendants fail to rebut the key allegation that "NSF International is the *ultimate* corporate parent of and *controls* the actions of Amarex." *Id.* ¶ 16 (emphasis added).

Defendants' statements in this litigation contradict their own public representations about their relationship, creating confusion that they refuse to resolve. If the Court concludes that additional factual information is needed to determine whether it has personal jurisdiction over NSF, the Court should therefore order jurisdictional discovery to determine the jurisdictional facts that Defendants are withholding. Such discovery is appropriate where, as here, "the record suggests

some indicia of personal jurisdiction," *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 449 (D. Md. 2019), and the "crucial information" concerning "the exact contours of" their corporate relationship is known only to Defendants. *See FrenchPorteIP, LLC v. Martin Door Mfg., Inc.*, 2014 WL 4094265, at *13 (D. Md. Aug. 14, 2014). Without jurisdictional discovery, CytoDyn has no access to these "easily obtainable, additional facts" that would inform the Court's jurisdictional inquiry. *Id.* at *13. CytoDyn has alleged specific facts tending to show that NSF's relationship with Amarex subjects it to personal jurisdiction in Maryland, and Defendants do not offer "specific denials" of these allegations, *id.*, but rather vague and generalized claims about the Defendants' relationship that are irrelevant to the question of who controls Amarex. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 402 (4th Cir. 2003). Accordingly, if the Court does not deny Defendants' motion outright, it should permit limited jurisdictional discovery into these issues.

**III.     The Amended Complaint States Claims For Relief Against both NSF and Amarex.**

CytoDyn's Amended Complaint states claims for trespass to chattels and conversion. *Contra* Mot. 8-9. Defendants' Motion to Dismiss nevertheless argues that these claims should be dismissed, based on an obvious misreading of the Amended Complaint: Defendants claim that "nowhere . . . does the Amended Complaint request any form of relief from or against NSF," that "CytoDyn does not allege that NSF is depriving it of property," and that "CytoDyn never alleged (and cannot allege) [that] NSF exercised control over its property[.]" Mot. 8-9. However, on the first page of the Amended Complaint, CytoDyn defined "Amarex," as used throughout the Amended Complaint, to refer to *both* Amarex Clinical Research LLC and NSF International, Inc. Everything that the Amended Complaint alleges about Amarex, it therefore also alleges about NSF, including that NSF "has . . . refused to turn over the clinical data and EDC to CytoDyn," Am. Compl. ¶ 89, that NSF is "exerting ownership and dominion over CytoDyn's personal property,"

9

*id.* ¶ 90, and that NSF "has dispossessed CytoDyn of its EDCs and data," *id.* ¶ 95. While it is true, therefore, that CytoDyn has no contract with NSF, the Amended Complaint states claims against NSF for conversion and trespass to chattels under Maryland law.

Further, although Defendants attempt to incorporate by reference their opposition to CytoDyn's Motion for Preliminary Injunction, there is nothing in that brief that supports dismissal of CytoDyn's breach of contract claim against Amarex.[4] To survive a motion to dismiss for failure to state a claim, a complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Somerville v. W. Town Bank & Tr.*, Civ. No. PJM 19-00490, 2019 WL 6131288, at *1 (D. Md. Nov. 19, 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). When ruling on a motion to dismiss, the Court should consider only the allegations in the complaint, as well as documents properly incorporated into the complaint or matters of public record. *Chesapeake Bay Foundation, Inc. v. Severstal Sparrows Point*, 794 F. Supp. 2d 602, 611 (D. Md. 2011). A court may not, however, "consider [other forms of] extrinsic evidence at the 12(b)(6) stage. *Id.* To state a claim for breach of contract under Maryland law, CytoDyn must offer allegations sufficient to "show that 'the defendant owed the plaintiff a contractual obligation and

---

[4] Defendants gesture to their opposition to CytoDyn's Motion for Preliminary Injunction as a basis to "dismiss" CytoDyn's requests for injunctive relief. Mot 9. But as the Court assesses the plausibility of CytoDyn's allegations at the motion to dismiss stage, it must apply a different standard than will apply to the Motion for Preliminary Injunction. *See Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 515 (D. Md. 2019) (noting the difference in standards of review for a motion for a preliminary injunction and motion to dismiss). Defendants' response does not address the proper standard for dismissal at all, and relies on extrinsic evidence inappropriate for consideration on a motion to dismiss. *See, e.g.*, Defs.' Opp. to Mot. for Preliminary Injunction 6 (arguing, based on extrinsic declaration evidence, that Maryland's "first material breach" rule precludes CytoDyn from prevailing on the merits); *see also* Plf.'s Reply in Support of Motion for Preliminary Injunction 7-8 (explaining that the "first material breach" doctrine does not apply because "[t]his doctrine only excuses a non-breaching party's performance when such obligations were dependent upon the promises that the breaching party failed to perform" (quoting *Monster Daddy, LLC v. Monster Cable Prod., Inc.*, 483 F. App'x 831, 835 (4th Cir. 2012))).

that the defendant breached that obligation.'" *WSC/2005 LLC. V. Trio Ventures Assocs.*, 190 A.3d 255, 265 (Md. 2018) (quoting *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 776 A.2d 645 (2001)). The Amended Complaint readily satisfies both elements.

As CytoDyn alleges in its Amended Complaint, the plain language of the MSA leaves no doubt that CytoDyn owns the EDC for each clinical trial and the data produced in the trials, which Amarex must turn over to CytoDyn upon request. Am. Compl. ¶ 36; *see Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007) ("If the language of the contract is unambiguous, we give effect to its plain meaning . . . ."). Section 5.2 states that "CytoDyn owns all right, title and interest . . . in and to all information, materials, documents and raw data . . . developed by Amarex as a result of performing the Services, including without limitation any Deliverables[,] and . . . CytoDyn's Confidential Information (all such information and materials, 'Client Materials')." Section 4.1 further obligates Amarex "to return or destroy any Confidential Information to [CytoDyn] at the request and cost of [CytoDyn]," including "all information, materials, documents and raw data . . . developed by Amarex as a result of performing the Services." Am. Compl. ¶ 37. Thus, Amarex must return the data to CytoDyn, which owns the data.

The MSA does *not* permit Amarex to withhold EDC or data requested by CytoDyn. The MSA authorizes Amarex to withhold "the results of data analysis for any Data Safety Monitoring Board Meetings, Interim Analyses, and/or Final Analyses" in the event of nonpayment. But, it is not allowed to withhold anything else, including the EDC databases and the clinical data they contain. The specific reference to certain obligations of Amarex that are excused by nonpayment limits those obligations that are *not* excused by nonpayment—including the turnover of CytoDyn's data.

Moreover, MSA Section 2.4 states that "CytoDyn shall be entitled, with at least 24 hours' prior notice, to audit and inspect records, facilities used, and the conduct of the Services relating to a Project Work Order under this Agreement." This obligation is not excused by nonpayment either, or else the parties would have included in the section where they identified the duties that *are* excused by nonpayment. The text of the parties' contract therefore is clear and it should control. *See Cochran v. Norkunas*, 919 A.2d 700, 709 (Md. 2007) ("If the language of the contract is unambiguous, we give effect to its plain meaning . . . ."). Amarex fails to offer any alternative reading of these crucial clauses of the MSA. As a result, CytoDyn's interpretations of the contractual language are undisputed and must control for purposes of deciding the Motion to Dismiss. Accordingly, the Amended Complaint states a claim for breach of the MSA.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

DATED: December 7, 2021

Respectfully submitted,
/s/ Lucas W.E. Croslow
Mark D. Hopson*
Benjamin M. Mundel†
Jacquelyn E. Fradette
Lucas W.E. Croslow†
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000

*Counsel for Plaintiff CytoDyn, Inc.*

\* Application for admission pending
† Admitted *pro hac vice*

275223194